[L. A. No. 17734. In Bank. July 14, 1943.]

THE PEOPLE, Plaintiff and Appellant, v. WESTERN FRUIT GROWERS, INC. (a Corporation), Respondent; W. B. PARKER, as Director of Agriculture, etc., et al., Cross-Defendants and Appellants.

Earl Warren, Attorney General, Robert W. Kenny, Attorney General, Walter L. Bowers, Deputy Attorney General, Ivan G. McDaniel and George C. Lyon for Appellants.

G. V. Weikert for Respondent.

EDMONDS, J.—The attorney general sued in the name of the People of the State to enjoin Western Fruit Growers, Inc. from shipping oranges in intrastate commerce in excess of allotments fixed by the Director of Agriculture under a license which, it is contended, is authorized by the California Agricultural Adjustment Act of 1935 as amended in 1937 (Stats. 1937, ch. 910, p. 2501; Deering's Gen. Laws, 1937 ed. p. 75 [Act 146]). By a cross-complaint in which the Director of Agriculture, certain of his departmental officers, and the members of the committees established by the license were named as defendants, Fruit Growers sought an injunction restraining the enforcement of the license pending the final determination of the suit. Upon a hearing, the application of the People was denied and that of Fruit Growers granted. The People's appeal is from that order.

Under the terms of the statute which the Director of Agriculture is endeavoring to enforce, by means of licenses he may restrict, under specified conditions, the production, distribution, and marketing in intrastate commerce of the particu-

lar grades and quantities of California grown food products designated by him. ■ The purpose of the act is to provide a regulation of intrastate commerce which will be correlated with the corresponding regulation of interstate commerce in the same commodities. (*Brock* v. *Superior Court*, 9 Cal.2d 291, 293 [71 P.2d 209, 114 A.L.R. 127].)

Acting under the authority of the 1935 legislation, the Director of Agriculture issued, effective January 14, 1936, License No 2 regulating the marketing of oranges and grapefruit grown in this state. It provides that weekly during each varietal season of oranges, a Distribution Committee composed of shippers of oranges shall recommend to the Director of Agriculture the total amount of oranges to be shipped in intrastate commerce during the following week. The Growers Advisory Committee, also established by the license, shall recommend to the director the proportion of the total weekly shipments to be shipped from each prorate district and determine the proportion of the particular variety of oranges controlled by each shipper. Upon these determinations, according to the license, the director shall fix the weekly allotments for each shipper.

In 1937, the Legislature passed an act "to amend" the 1935 legislation by amending 20 of the 26 sections, repealing four of them and adding a new one. (Stats. 1937, p. 2501.) By one of these amendments, the short title of the act was declared to be "The California Agricultural Products Marketing Act of 1937." Section 18 of the 1935 enactment was amended to read as follows: "Any marketing agreement or license, or both, and each and every provision thereof heretofore executed or issued by the Director of Agriculture are hereby continued in effect and deemed to be within the standards and provisions of these amendments, subject however to the provisions hereof for amendment and termination. The term 'license,' as it may appear elsewhere in this act, is deemed identical in meaning and application with the term 'marketing order' as defined and used in these amendments, and shall be so construed in reading this act." After the 1937 statute became effective, the Director of Agriculture did not terminate License No. 2, but is still acting under it in restricting the amounts of oranges marketed in intrastate commerce, and the Growers Advisory Committee and the Distribution Committee have continued to make recommendations in accordance with its terms.

Since July 10, 1936, according to the complaint of the attorney general, License No. 2 has been continuously in effect, and under it, the Director of Agriculture has fixed, and continues to fix, weekly allotments of oranges which may be shipped within the state by those shippers who apply for them. Fruit Growers, the complaint continues, applied to the director and was given specified allotments. From December 17, 1939 to February 3, 1940, however, it wilfully and knowingly shipped over 1700 boxes in excess of its quota, and has threatened to make additional shipments in violation of the license and of the statute. Unless further violations are enjoined, its acts will cause irreparable damage in that pecuniary compensation cannot afford adequate relief, and enforcement of the provisions of the license and statute against other producers and handlers of oranges is inequitable if Fruit Growers does not comply with them. Upon these allegations, the court was asked to issue a permanent injunction and award the sum of $1,000 as a reasonable attorney's fee.

By answer, Fruit Growers admits the overshipments of oranges, but denies that they were made in violation of the statute or that there was or is a valid license or marketing order regulating the handling in intrastate commerce of oranges or grapefruit in this state. In the cross-complaint, it asserts that License No. 2 is invalid and void and it prays for a declaration to that effect. The court is also asked to issue a preliminary injunction restraining the director and the other cross-defendants from enforcing the license pending the final determination of the suit.

The principle is universally recognized that all presumptions and intendments are in favor of the constitutionality of a statute and all doubts should be resolved in favor of its validity. (*Ray* v. *Parker,* 15 Cal.2d 275, 280 [101 P.2d 665] ; *Jersey Maid Milk Products Co.* v. *Brock,* 13 Cal.2d 620, 636 [91 P.2d 577].) In justifying the order of the superior court, however, Fruit Growers relies upon three points: (1) that the 1937 act is a revision of the 1935 statute and is consequently void because it was not reenacted and published at length as required by section 24 of article IV of the California Constitution; (2) That the 1937 act, if valid, repealed the 1935 act, and nullified License No. 2 which had then been issued; and (3) section 18 of the 1935 statute,

as amended by section 19 of the new law, is not a valid saving clause and did not continue in effect License No. 2.

The attorney general takes issue with each of these contentions, and, in addition, asserts that Fruit Growers is estopped to deny the constitutionality of the 1937 act, or the validity of the license, because it has accepted the benefits of the prorate program. And, he continues, the respondent is barred from relief by its laches in waiting for more than four years from the time the program was put into effect before questioning the validity of the license and the statute under which it was issued, to the disadvantage of those who have conformed to its requirements. Finally, the attorney general contends, the respondent has failed to state facts in its cross-complaint sufficient to constitute a cause of action for injunctive relief, first, because it seeks an injunction to abrogate the exercise of official discretion placed in the director by the Legislature to determine whether licenses issued prior to the effective date of the 1937 act continued to effectuate the declared policy of that statute; and second, for the reason that it has failed to allege or show that irreparable injury is caused by the continued operation of License No. 2 so as to entitle it to the equitable relief of injunction.

Only sections 15a and 19 of the 1935 statute were left unchanged by the 1937 legislation. Section 19 provides that "Chapter 1029, of the Statutes of 1933 [the original act], is hereby repealed." Section 15a requires the Director of Agriculture to deposit specified moneys received by him in the State treasury to the credit of the Department of Agriculture fund. All of the 20 sections amended by the 1937 act were reenacted and published at length as amended, but such a complete change as that contemplated by the 1937 act, says the respondent, constitutes a revision of the existing law and not an amendment of it. And because the Legislature did not reenact sections 15a and 19 in the 1937 statute, and did not publish the entire act as revised, the constitutional mandate has been ignored.

■ The California Constitution declares: "No law shall be revised or amended by reference to its title; but in such case the Act revised or section amended shall be re-enacted and published at length as revised or amended. . . ." (Art. IV, sec. 24.) In the absence of such a provision, legislative bodies commonly amended an act or a section of it by di-

recting the insertion, omission or substitution of certain words, or by adding a provision, without setting out the entire context of the section as amended. (*Fletcher* v *Prather*, 102 Cal. 413, 418 [36 P. 658] ; and see notes in 55 L.R.A. 833, 855; 86 Am.St.Rep. 276-279.) The objection to this method of amendment was the uncertainty and difficulty of correctly reading the original section as later changed.

To avoid the mischief inherent in the mechanics of this legislative process, the People of California imposed certain requirements upon the Legislature, but the provision should be reasonably construed and limited in its application to the specific evil which it was designed to remedy. It is not to be technically measured, nor used as a weapon for striking down legislation which may not reasonably be said to have been enacted contrary to the specified method. (*Evans* v. *Superior Court*, 215 Cal. 58, 62 [8 P.2d 467] ; *Heron* v. *Riley*, 209 Cal. 507, 510 [289 P. 160] ; *McClure* v. *Riley*, 198 Cal. 23, 26 [243 P. 429] ; *Beach* v. *Von Detten*, 139 Cal. 462. 465 [73 P. 187] ; *Shields* v. *Oxnard Harbor Dist.*, 46 Cal. App.2d 477, 486 [116 P.2d 121].)

In complying with the People's mandate, the Legislature may use either an existing statute or a section of it as the basis for changing an existing law. The decision as to which unit shall be used is one to be made by the Legislature in its discretion. There are occasions when the public interest may best be served by the publication and reenactment of a statute as a whole; in considering other legislation, the publication and reenactment of the sections affected may be sufficient for all purposes. The determination of the Legislature will not be questioned by the courts, but when the unit to be used as the basis for the new legislation has been determined, the constitutional provision must be followed.

Neither the purpose of the change nor the number of sections to be rewritten has any bearing upon the issue. While abstractly there may be differences in meaning between the words "revise" and "amend," they are interchangeable in the sense in which they are used in the Constitution; in either case the revising or amending act is intended as a substitute for the original statute or section, continuing in force that which is reenacted and repealing what is omitted. (*Pierce* v. *County of Solano*, 62 Cal.App. 465, 469 [217 P. 545].)

This problem was considered in *Beach* v. *Von Detten, supra,* p. 464, where it was said: "Nor does it make any difference that fifty-eight sections of the original act of two hundred and thirty-four sections were thus amended. If one section could be amended in the way in which it was done in this case, fifty-eight could be so amended. There is no law that makes the amendment of one section of an act embracing two hundred and thirty-four sections a 'revision.' If the amendment of one section is not a revision, neither is the amendment of two sections, nor of fifty-eight sections. Of course, every amendment of any section is in one sense a revision of that section, but it is not a revision in the sense of the Constitution." Quite inconsistently, in its subsequent discussion, the court declared "that an act consisting of many sections might be changed in many respects, the subject treated of differently, the sections differently arranged and differently numbered, and yet retain one or more complete sections of the original act. In such case the act would be a revision." This statement was not, however, essential to the decision and it is contrary to the holding that if one section of a statute may be amended without setting forth the entire act, no reasonable construction requires publication of the former legislation in its entirety because other sections are amended at the same time. ■ If, therefore, the Legislature elects to change a statute by the method of section-by-section amendment, no constitutional violation occurs so long as each section is published and reenacted at length, regardless of the number of sections so changed.

In applying these rules it is necessary to determine which unit, act or section, the Legislature intended to use and the solution of the problem may often be found in the language of the new enactment. Thus Justice McFarland, speaking for the court in *Lewis* v. *Dunne,* 134 Cal. 291 [66 P. 478, 86 Am.St.Rep. 257, 55 L.R.A. 833], emphasized that the title of the act there under consideration commenced with the words "An act to revise . . ." The preamble of the statute declared that by a certain act a commission had been appointed "for the revision and reforming of the law," and recited that, "for the purpose of revising said code, the people of the state . . . do enact as follows." The court concluded that the act was intended as a revision. (See also the reference to the basis for the decision in *Lewis* v. *Dunne, supra,* in the concurring opinion of McFarland, J., in *Beach* v. *Von*

*Detten, supra.*) In *Beach* v. *Von Detten, supra,* the title of the new statute began with the words "An act to amend" the original act "by amending certain sections thereof, repealing certain other sections, and adding certain sections thereto." "It is therefore clear," said the court, "that the legislature thought it was amending certain sections of the act. . . ." (p. 464.) And in *People* v. *Oates,* 142 Cal. 12, 13 [75 P. 337], the court said: "We do not think the act before us is anything more than what its title declares it to be,—viz., 'An act to amend' the sections named and 'to repeal' certain sections named and to 'add a new section' to the Penal Code. It is in no sense a revision of the entire code." But although the legislation considered in *Evans* v. *Superior Court, supra,* pp. 62, 65 commenced with the words, "An act to revise," the court held it was a "new and original piece of legislation. Its terms are not revisory or amendatory of any former act. Consequently, the provision of the Constitution requiring that revised or amended laws shall be 'published at length as revised or amended' does not apply, even though the provisions of the Probate Code may be inconsistent with existing statutes."

The title of The California Agricultural Products Marketing Act of 1937 recites that it is, "An act to amend" the 1935 statute "by amending" enumerated sections, "to add a new section . . . , and to repeal" certain sections of the 1935 law. Each section of the 1937 act begins with the declaration that a specified section of the 1935 statute "is hereby amended to read as follows." According to that language, the Legislature unquestionably intended to use the section-by-section amendment procedure, and as it published at length the sections as amended, there was no violation of the constitutional mandate.

Turning to the issue concerning the validity of License No. 2, the attorney general does not question the respondent's contention that the requirements for the issuance of licenses under the 1935 act differ essentially from those contained in the 1937 amendments. And he admits that License No. 2 was not promulgated in accordance with the provisions of the 1937 act. But he takes the position that a license issued under the 1935 act which effectuated its declared policy might also carry out the purpose of the 1937 amendments. The Director of Agriculture made his investigations

and findings concerning the policy which should be followed, says the attorney general, and as he determined that License No. 2, issued under the 1935 act, conforms to the aims of the 1937 amendments, the license is continued in effect by section 18 of the 1935 law as amended by section 19 of the 1937 statute, subject of course to the standards of operation set forth in the later legislation.

Section 18, as amended, provides: "Any . . . license . . . and each and every provision thereof heretofore executed or issued by the Director of Agriculture are hereby continued in effect and deemed to be within the standards and provisions of these amendments, subject however to the provisions hereof for amendment and termination. The term 'license' . . . is deemed identical in meaning and application with the term 'marketing order' as defined and used in these amendments. . . ." This section undoubtedly purports to continue in effect all licenses issued under the 1935 act prior to the effective date of the 1937 amendments but subjects them as to any future amendments, or as to their manner of termination, to the requirements of the 1937 provisions governing such action. Consequently, if section 18, as amended, is valid, License No. 2 is still in effect; the respondent is subject to its restrictions; and the 1937 provisions as to the issuance of marketing orders become immaterial.

The respondent claims that section 18 is invalid because in violation of the constitutional provision: "The Legislature shall not pass local or special laws in any of the following enumerated cases . . . : . . . Giving effect to invalid deeds, wills, or other instruments . . . Legalizing, except as against the state, the unauthorized or invalid act of any officer . . . In all other cases where a general law can be made applicable." (Art. IV, sec. 25.) The saving clause is unconstitutional because, so the respondent reasons, it attempts to give effect to an invalid instrument. And the validity of the license is challenged upon the ground that it does not conform to the requirements and measure up to the standards fixed by the 1937 act, and also as an attempt to legalize the unauthorized acts of the appellants. The saving clause thus discriminates, the respondent continues, between the producers and handlers of oranges and grapefruit, and the producers and handlers of lemons, limes, tangerines, and

other competing agricultural commodities not covered by licenses under the 1935 act. This is a situation where a general statute can be made applicable, says the respondent, the 1937 act being such a law if the saving clause is eliminated, consequently, section 18, as amended, is special legislation within the meaning of the constitutional prohibition.

The respondent relies upon the case of *Brock* v. *Superior Court*, 12 Cal.2d 605 [86 P.2d 805], as determinative of the question. That case was a proceeding in prohibition to compel the respondent court to dissolve a temporary injunction restraining the enforcement of License 2 insofar as it regulated the intrastate marketing of grapefruit. The injunctive order was secured upon a complaint which alleged that the license attempted to regulate two distinctly different industries in violation of the act, and that no valid federal agreement or license controlling interstate marketing by the same agricultural industry was in effect, as required by the statute when the license was issued. The court accordingly held that the plaintiffs were entitled to findings of fact upon these issues, and since the respondent court had jurisdiction to grant the temporary injunction, it would not be prohibited from determining them. The petitioners had argued that the writ should issue because any defects in the license had been cured and "validated" by the amendments of 1937. Insofar, however, as the saving clause purported to validate licenses which were defective under the 1935 act, said the court, it was an unconstitutional special law "giving effect to invalid deeds, wills, or other instruments," or "legalizing . . . the unauthorized or invalid act of any officer."

Obviously the two subdivisions of section 25 of article IV considered in *Brock* v. *Superior Court, supra,* have no application to a valid instrument or to an authorized act of a state official, and that decision is not determinative of the present proceeding. For here no question is raised as to the validity of License No. 2 under the 1935 act, or as to any want of authority of the Director of Agriculture to promulgate it. The issue now presented is a narrow one, namely, whether the action of the Legislature in continuing a license which was validly issued to regulate the marketing of commodities in a particular agricultural industry, is unconstitutional special legislation because one to restrict the distribution of agricultural products not regulated under the

1935 legislation must be issued upon different conditions and requirements.

In the leading case in this state on the question of the distinction between a general and special law, the court declared that a law is a general one when it applies equally to all persons embraced in a class founded upon some natural, intrinsic, or constitutional distinction; on the other hand, it is special legislation if it confers particular privileges, or imposes peculiar disabilities or burdensome conditions, in the exercise of a common right, upon a class of persons arbitrarily selected from the general body of those who stand in precisely the same relation to the subject of the law. (*City of Pasadena* v. *Stimson,* 91 Cal. 238, 251, 252 [27 P. 604]; and see *Ray* v. *Parker, supra; Jersey Maid Milk Products Co., Inc.* ·v. *Brock, supra; Frank* v. *Maguire,* 201 Cal. 414 [257 P. 515]; *Martin* v. *Superior Court,* 194 Cal. 93 [227 P. 762]; *Reclamation Dist. No. 1500* v. *Riley,* 192 Cal. 147 [218 P. 762]; *In re Sumida,* 177 Cal. 388 [170 P. 823]; *Matter of Stoltenberg,* 165 Cal. 789 [134 P. 971]; *Matter of Miller,* 162 Cal. 687 [124 P. 427].) Under this rule, it is apparent that the constitutional prohibition of special legislation does not preclude legislative classification but only requires that the classification be reasonable. (*In re Willing,* 12 Cal.2d 591 [86 P.2d 663]; *Barker Bros., Inc.* v. *City of Los Angeles,* 10 Cal.2d 603 [76 P.2d 97]; *In re Weisberg,* 215 Cal. 624 [12 P.2d 446]; *Seaboard Acceptance Corp.* v. *Shay,* 214 Cal. 361 [5 P.2d 882]; *Watson* v. *Division of Motor Vehicles,* 212 Cal. 279 [298 P. 481]; *Bacon Service Corp.* v *Huss,* 199 Cal. 21 [248 P. 235].)

Problems of classification under the California Constitution are thus similar to those presented by the federal equal protection of the laws clause of the 14th Amendment. Under either provision, the mere production of inequality which necessarily results to some degree in every selection of persons for regulation does not place the classification within the constitutional prohibition. The discrimination or inequality produced, in order to conflict with the constitutional provisions, must be "actually and palpably unreasonable and arbitrary," or the legislative determination as to what is a sufficient distinction to warrant the classification will not be overthrown. (*Radice* v. *New York,* 264 U.S. 292, 296 [44 S.Ct. 325, 68 L.Ed. 690]; *Arkansas Natural Gas Co.* v. *Arkansas Railroad Com.,* 261 U.S. 379, 384 [43 S.Ct. 387,

67 L.Ed. 705]; *In re Livingston,* 10 Cal.2d 730, 740 [76 P.2d 1192]; *Rainey* v. *Michel,* 6 Cal.2d 259 [57 P.2d 932, 105 A.L.R. 148]; *Los Angeles City School Dist.* v. *Griffin,* 3 Cal.2d 651 [46 P.2d 141]; *In re Weisberg, supra; Martin* v. *Superior Court, supra; Western Indemnity Co.* v. *Pillsbury,* 170 Cal. 686 [151 P. 398]; *In re Cardinal,* 170 Cal. 519, 526 [150 P. 348, L.R.A.1915F 850].)  ▮▮▮  When a legislative classification is questioned, if any state of facts reasonably can be conceived that would sustain it, there is a presumption of existence of that state of facts, and the burden of showing arbitrary action rests upon the one who assails the classification. (*In re Fuller,* 15 Cal.2d 425, 437 [102 P.2d 321]; *McCreery* v. *McColgan,* 17 Cal.2d 555, 562 [110 P.2d 1051, 133 A.L.R. 800]; *In re Livingston, supra; Sequoia Nat. Park Stages Co.* v. *Sequoia & General Grant Nat. Parks Co.,* 210 Cal. 156 [291 P. 208]; *Martin* v. *Superior Court, supra; In re Cardinal, supra; County of Los Angeles* v. *Hurlbut,* 44 Cal.App.2d 88 [111 P.2d 963]; *Pacific Gas & Elec. Co.* v. *Moore,* 37 Cal.App.2d 91 [98 P.2d 819],)

Growers and shippers of agricultural commodities who may be subject to the prorate program under the California Agricultural Products Marketing Act of 1937 are classified by that statute into two groups: (1) Those who were already operating a prorate program under a license issued under the statute of 1935; and (2) Those who had not yet instituted such a program. New and different requirements for the issuance of a license are imposed upon those in the second group, but no claim is made that the committees would operate any differently under a marketing order issued under the 1937 act than under a license issued prior to the effective date of that statute. Regardless of which act governed the issuance of a particular license or marketing order, any future action with reference to its operation, such as its amendment or termination, must comply with the provisions of the 1937 amendments. Under these circumstances, the only question for decision is whether the continuance of licenses issued upon different but valid conditions (see *Brock* v. *Superior Court, supra*) without subjecting those operating under such existing licenses to the new requirements for the issuing of licenses in the future under the 1937 amendments is unreasonable class legislation.

The Legislature, in adopting a policy, may adapt legislation to an existing situation. It is upon this basis that the exemption of existing structures from zoning ordinances has been held valid (*City of Aurora* v. *Burns,* 319 Ill. 84 [149 N.E. 784] ; *City of Norton* v. *Hutson,* 142 Kan. 305 [46 P.2d 630]), and regulations governing the construction and occupation of certain types of existing buildings different from those required for structures to be erected have been upheld (*Matter of Stoltenberg, supra*). For the same reason, courts have sustained the grant of a preferred position to prior applicants for certificates of convenience and necessity to operate motor vehicles over a given route. (*Bradley* v. *Public Utilities Commission of Ohio,* 289 U.S. 92 [53 S.Ct. 577, 77 L.Ed. 1053, 85 A.L.R. 1131].) Similarly, laws amending vocational and professional standards may provide for the continuance of licenses issued prior to the amendment. (*Ex parte Whitley,* 144 Cal. 167, 171 [77 P. 879, 1 Ann.Cas. 13] ; *Bohannon* v. *Board of Medical Examiners,* 24 Cal.App.215 [140 P.1089] ; *People* v. *Walsh,* 346 Ill. 52 [178 N.E. 343] ; *Gerard* v. *Smith,* (Tex.CivApp.) 52 S.W.2d 347.) And this court has sustained the validity of an amendment to section 4463 of the Political Code by which the Legislature changed the requirements necessary for a newspaper to be one of general circulation, exempting from the new requirement existing newspapers of general publication as they were defined by the prior statute. (*In re Byers,* 219 Cal. 446 [27 P.2d 641].) Also, in *Whittier etc. Ass'n.* v. *Agricultural Prorate Commission,* 11 Cal.2d 470, 478 [80 P.2d 983], the 1935 amendments to the Agricultural Prorate Act of 1933, changing both the requirements for the formation of a district or zone under the act and the standards of future operation of the program fixed by the act, were held applicable to existing districts validly organized before amendment of the statute only in so far as the future operations of the districts were concerned. Such districts, said the court, were not affected by the changed requirements for the organization of new districts.

In the present action, no contention is made that Fruit Growers, or any other handler of citrus fruits, would be subjected to any different regulation if the license or marketing order had been issued under the 1937 statute rather than the earlier one. Presumably the same types of committees would function under a license issued in accord-

ance with either law and would allocate proration allotments in a similar manner. Undoubtedly the growers and shippers of oranges had adjusted their production and facilities to the program instituted under the 1935 act. Under these circumstances, the recognition of an existing system of regulation and the exception of it from new requirements affecting only the issuance of such licenses while subjecting all licenses to the same standards of future operation, is not a palpably unreasonable classification.

The respondent also challenges the validity of section 19 of the 1937 act, amending section 18 of the 1935 statute, upon the ground that it is "inconsistent, self-contradictory, and unintelligible" in providing that the pre-existing licenses shall be subject to the 1937 provisions for amendment and termination. Section 11 of the 1937 act amends section 10 of the 1935 statute to provide that, whenever the director believes an amendment to a marketing order is necessary, he shall call a hearing upon the amendment which shall be held in the same manner and upon the same notice as upon an original marketing order. In what manner and upon what notice is such a hearing to be held, asks the respondent, where, as in the case of the license under consideration, no hearing was held prior to its issuance as a marketing order under the 1937 act? But contrary to the fact assumed by the question, License No. 2 was not issued under the 1937 law. And the answer to the respondent's inquiry is found in the clear words of the provision: "in the same manner and upon the same notice as upon an original marketing agreement or marketing order." Since by section 18, as amended, the procedure of amending a license is required to conform as nearly as possible to the provisions in the 1937 statute, the manner and notice required for an amendment of a license is the same as that required for the issuance of a marketing order under the 1937 act.

Section 11 of the 1937 statute further provides: "In considering such amendment, the director shall take into consideration the evidence presented at the original hearing on the marketing agreement or marketing order to which such amendment is proposed and upon any prior amendment thereto." How, the respondent asks, could the director take into consideration the evidence presented at the original hearing on the present alleged marketing order when no

such hearing was held, and no evidence was presented under the 1937 act? But nothing in the language of this provision limits the consideration of the director to evidence introduced at a hearing held in accordance with the 1937 law. In its cross-complaint, the respondent alleges that notice of hearing was given and a series of public hearings was held by the Director of Agriculture during 1935 and 1936 prior to the issuance of License No. 2. All that the new statute requires is that if the director desires to amend License No. 2, he must take into consideration the evidence presented at these hearings.

The respondent refers to the provision of section 11 that "No amendment to a marketing order shall be effective until approved in the same manner as required by section 7 of this act for the original marketing order to which such amendment was proposed." What approval would be required, it asks, to effectuate an amendment to the license here in question, which was never approved as a marketing order by any producer or handler in the first place, as required by section 7, as amended? The provision must be given a reasonable construction in view of the obvious purpose expressed in section 18, as amended in 1937, to require the procedure of changing a license or marketing order to conform to that statute as closely as possible. With this end in view, the only reasonable interpretation of the clause is that an amendment to a license must be approved in the same manner as required for the issuance of new licenses under the legislation now in force, thus effecting the equality and uniformity of future operation contemplated by the Legislature both as to licenses issued before and after the effective date of the 1937 amendments.

One other clause of section 18, as amended, must be considered,—the provision that the licenses theretofore issued by the director are continued in effect "and deemed to be within the standards and provisions of these amendments" but subject to the 1937 provisions for the amending and termination of marketing order. The quoted language must be considered in its context. The Legislature certainly knew that the provisions of the two acts differed, as otherwise there would be no purpose in adding the proviso subjecting existing licenses to the new provisions for amendment and termination. As so construed, the quotation merely means that, in the opinion of the legislators, the primary

objectives of the 1935 and the 1937 statutes are essentially the same.

Such a legislative determination, although not binding upon the court, will be given great weight. However, an examination of the provisions of both acts shows that their purpose is identical. Thus section 1 of the 1935 law declares that the widespread agricultural collapse and disorganization prevents the agricultural producers from earning a sufficient return to enable them to contribute their fair share to the support of ''ordinary governmental and educational functions and unduly increasing tax burdens of others in the State for those purposes.'' The aim of the statute, the section continues, is to prevent ''the unreasonable and unnecessary waste of agricultural wealth through disorderly, improper or uneconomic marketing or overproduction of agricultural commodities or the marketing of agricultural commodities in excess of reasonable market demands, but preserving to all producers thereof equality of opportunity in the available market.'' Section 1 of the 1937 act states that the ''unreasonable waste and inefficient use of agricultural resources'' occasioned by the marketing within the state of greater quantities of agricultural commodities than are reasonably necessary to supply the demand and the disorderly marketing of them is opposed to public interest. Such economic conditions imperil the ability of agricultural producers ''to contribute . . . to the support of ordinary governmental and educational functions, thus tending to increase and increasing the tax burdens of other taxpayers for the same purposes,'' and all render it impossible for agricultural producers to be reasonably assured a reasonable standard of living. In the interest of public welfare, the section concludes, ''the unreasonable waste and inefficient use of agricultural resources should be eliminated, while at the same time preserving to all agricultural producers an equality of opportunity.''

Again, section 21 of the 1935 act (Stats. 1935, ch. 307, p. 1044) and section 4 of the 1935 amendments (Stats. 1935, ch. 416, pp. 1470, 1471) both provide: ''The economic conditions of agricultural producers throughout the State are such as to require immediate relief if their purchasing power and taxpaying ability are to continue and their morale and standard of living are not to be undermined. Such relief

can be afforded only by the orderly production and marketing of agricultural products and the coordination of State control of production and marketing with Federal control, each of which supplements the other and makes the same effective.'' Section 20 of the 1937 statute is practically identical in language, and reads: ''The economic conditions of agricultural producers throughout the State are such as to require immediate relief, if their purchasing power and taxpaying ability are to continue and their morale and standard of living are not to be undermined. Such relief can be afforded only by the orderly production and marketing of agricultural products and the establishment of marketing agreements and marketing orders which assure stabilized and orderly distribution of agricultural products which can not otherwise be so marketed.'' Both the 1935 and 1937 acts also provide for the elimination of unfair methods of competition. From these provisions, it is apparent that the Legislature enacted both statutes for the same purpose: The assurance to agricultural producers of a reasonable standard of living through the elimination of overproduction and uneconomic and wasteful marketing methods and unfair methods of competition through the establishment of administrative committees equitably to apportion among the producers and handlers of agricultural commodities the amount of the commodity which may be marketed in order to more accurately equalize supply and demand for that commodity.

The order is reversed.

Gibson, C. J., Shenk, J., Curtis, J., Carter, J., and Traynor, J., concurred. Schauer, J., did not participate herein.