[S. F. No. 17331. In Bank. Dec. 6, 1946.]

S. A. FERRANTE, etc., et al., Petitioners, v. THE FISH & GAME COMMISSION OF THE STATE OF CALIFORNIA, Respondent.

[S. F. No. 17332. In Bank. Dec. 6, 1946.]

O. ENEA, etc., et al., Petitioners, v. THE FISH & GAME COMMISSION OF THE STATE OF CALIFORNIA, Respondent.

[S. F. No. 17333. In Bank. Dec. 6, 1946.]

FRANK P. LUCIDO, etc., et al., Petitioners, v. THE FISH & GAME COMMISSION OF THE STATE OF CALIFORNIA, Respondent.

[S. F. No. 17334. In Bank. Dec. 6, 1946.]

WESTERN SARDINE COMPANY, INC. (a corporation), Petitioner, v. THE FISH & GAME COMMISSION OF THE STATE OF CALIFORNIA, Respondent.

[S. F. No. 17335. In Bank. Dec. 6, 1946.]

SALVATORE THOMAS PALMA, etc., et al., Petitioners, v. THE FISH & GAME COMMISSION OF THE STATE OF CALIFORNIA, Respondent.

[S. F. No. 17356. In Bank. Dec. 6, 1946.]

ELWYN C. HALE and MABEL E. HALE, doing business under the firm name and style of ELWYN C. HALE FISHERIES, and ESTATE OF C. P. HALE, LTD., a limited copartnership, Petitioners, v. THE FISH & GAME COMMISSION OF THE STATE OF CALIFORNIA, Respondent.

Wm. B. Hornblower, Fabian D. Brown and Jefferson E. Peyser for Petitioners.

Hudson, Martin, Ferrante & Street, and Russell Zaches, as Amici Curiae, on Behalf of Petitioners.

Robert W. Kenny, Attorney General, and Ralph W. Scott, Deputy Attorney General, for Respondent.

Burnham Enersen, McCutchen, Thomas, Matthew, Griffiths & Greene, Pillsbury, Madison & Sutro, Eugene M. Prince, Eugene D. Bennett, Charles E. Finney, Richard H. Peterson, Charles J. Janigian and Charles P. Scully, as Amici Curiae, on Behalf of Respondent.

DOOLING, J. pro tem.—The six petitions herein considered present common questions. The several petitioners are seeking by writ of mandate to compel the respondent, Fish and Game Commission of the State of California, to grant to each of them a permit to take and use pilchard sardines during the 1946-1947 season for the purpose of reducing them into meal in plants severally owned and to be operated by the petitioners.

The petitions all contain similar, and in many respects identical, allegations. It appears therefrom that on October 27, 1945, the respondent adopted the following rules affecting applications for such permits:

"(b) For the 1946-47 sardine season only, no reduction permit shall be granted or issued to any applicant who did not hold a permit and operate in the previous season unless such an applicant produces proof satisfactory to the Fish and Game Commission that he has his plant, including all buildings and equipment therein, as described in rule H, fully constructed and fully equipped to receive and process fish at the time of filing his application. (14 C.A.C. 155(b).)

"(g) A permit may be issued to a plant only after it has been inspected by an accredited representative of the Fish and Game Commission and upon certification by said representative that the plant is fully equipped and ready to operate. The penalty for not being ready to operate on the first day of the season shall be a revocation of tonnage on the basis of the number of days such plant fails to operate. The amount revoked for each day shall be equal to the total tonnage granted to the permittee, divided by total number of days in the season in the district in which the plant is located." (14 C.A.C. 155(g).)

It further appears that the commission, in accordance with law, made a finding that 395,000 tons of pilchard sardines for the season 1946-1947 could be taken from the territorial water of California without adversely affecting the interest of the people of the state; and fixed May 15, 1946, as the last day for receiving applications for permits to take and utilize pilchard sardines for reduction to edible meal; that 109 applicants filed applications for such permits prior to the date fixed and that 99 of such applications were granted, 88 of them to applicants who had held permits for the previous season; and that the applications of the several petitioners were denied upon the ground that there was a substantial

failure to comply with rule B of the respondent commission, above quoted.

It is alleged in each of the petitions, except that of Western Sardine Company, Inc., that the several petitioners had contracted for the construction of fish reduction plants to be completed before May 15, 1946, but that due to delays caused by strikes over which the petitioners had no control the several plants were not entirely completed on May 15, 1946. The petition of Western Sardine Company, Inc., contains an allegation that its plant on May 15, 1946, was completed and ready for operation. This allegation has been denied and this petitioner has expressly withdrawn that issue from the court. Thus its case stands with the others as one in which its plant was not completed on May 15 of this year.

A factual difference in the allegation of the petition in S. F. No. 17356 should be noted. The petitioners in that case allege that all machinery and equipment were installed and their plant completed for operation on May 15, but that by reason of strikes and conditions beyond petitioners' control certain materials could not be obtained for the covering of a building housing said machinery and equipment and ''that said materials were and are not necessary to the operation of said plant and are not required under the rules and regulations promulgated by said respondent.''

The allegation (if that is its intent) that the rules did not require a completed building is contradicted by the language of rule B above quoted, ''including all buildings.'' The allegation that the plant could be operated in an uncompleted building we pass with the observation that it is certainly a proper requirement that all fish reduction plants be housed in buildings, and if the rule requiring the plant to be fully equipped to receive and process fish at the time the application is filed is valid, the requirement that the building in which the plant is housed be completed at that time is equally so.

This brings us to the main contentions upon which the petitioners rely. It is alleged in the several petitions that in the case of the 88 applicants who held permits in the previous season their applications were granted ''without any inquiry as to whether or not they had plants capable of operating, or even sites on which to erect a plant, and without any inspection of any kind or character whatsoever, and solely upon the basis of the provisions of Rule G.''

This alleged difference in treatment and the rules permitting it are attacked as unreasonably discriminatory.

Amici curiae ask us to sustain the difference in treatment accorded the veterans of the industry and those seeking permits for the first time on the ground that under section 1068, Fish and Game Code, the respondent commission has the power, if it determines that it would result in economic waste to issue permits to newcomers to the industry, to deny permits to them altogether and to limit its permits to those who have operated reduction plants in the previous year. This question is not necessarily involved in this proceeding since the respondent has not taken that position, but has actually issued permits to those newcomers to the industry who complied with Rule B. We accordingly expressly refrain from the decision of that question.

Assuming, as we must, that the respondent has determined that it is proper to issue permits to all applicants who have complied with its rules it may be taken as settled that in the allocation of pilchard sardines for reduction purposes the respondent may not arbitrarily discriminate among the applicants for such permits who meet the requirements fixed by respondent (*People* v. *Globe Grain & Milling Co.*, 211 Cal. 121, 126-128 [294 P. 3]), but that does not mean that the commission is without the power to make the classification that is here under attack. Certain obvious differences exist between the applicant who has successfully operated under a permit allowing him to engage in the reduction of sardines in the previous season and the applicant who seeks to engage in that business for the first time. The former had a plant fully equipped and operating in the previous season. He may be supposed to have established business connections, customers, a staff of employees and operatives for his plant and possibly contract commitments for the coming year. He clearly stands in a different position from the newcomer to the field. The placing of the newcomer in a separate class, and requiring him to have his plant ready for operation by May 15 can only be nullified by this court if we can plainly see that there is no "natural, intrinsic or constitutional distinction which reasonably justifies difference in treatment." (*Lelande* v. *Lowery*, 26 Cal.2d 224, 232 [157 P.2d 639]; *In re Herrera*, 23 Cal.2d 206, 212 [143 P.2d 345]; *People* v. *Western Fruit Growers*, 22 Cal.2d 494, 506-7 [140 P.2d 13];

*Sacramento M. U. Dist.* v. *Pacific G. & E. Co.*, 20 Cal.2d 684, 691 [128 P.2d 529]; *In Re Fuller*, 15 Cal.2d 425, 437 [102 P.2d 321]; *In re Weisberg*, 215 Cal. 624, 629 [12 P.2d 446].)

In *Bayside Fish Flour Co.* v. *Gentry*, 297 U. S. 422, 429 [56 S.Ct. 518, 80 L.Ed. 772], the Supreme Court of the United States said of a claim of unreasonable discrimination in an earlier statute of this state governing the processing of fish:

"It has never been found possible to lay down any infallible or all-inclusive test by the application of which it may be determined whether a given difference between the subjects of legislation is enough to justify the subjection of one and not the other to a particular form of disadvantage. A very large number of decisions have dealt with the matter; and the nearest approach to a definite rule which can be extracted from them is that, while the difference need not be great, the classification must not be arbitrary or capricious, but must bear some reasonable relation to the object of the legislation."

It is alleged in the answers that the classification attacked is predicated upon the following facts and was made for the following reasons:

The nature of the fish reduction industry demands that operators of reduction plants know well in advance of the season the number of permits to be granted and the quantity of sardines which will be allocated to each permit, because these factors enter into their seasonal contracts for supplies, labor, fish, and the sale of their products of reduction. Experience gained by respondent over a period of years has conclusively shown it that the applications of newcomers often have been attempts to secure permits with plants more imaginary than real and that assurances on the part of bona fide new applicants that they will be able to complete their plants by the opening of the sardine season or shortly thereafter largely result in failures. Such conditions do not prevail in the case of plants which were operated in the previous season. To grant applications of new applicants who have not completed plants is not conducive of a just, efficient and orderly administration of the law in that the uncertainty of the number of permits which ultimately will be issued leaves the successful applicants and the industry as a whole in confusion and doubt.

That respondent deems it inimical to public interest to permit trafficking in such permits by permittees who cannot

themselves make use of them and to that end has limited its permits to those who in fact have fully constructed and equipped reduction plants; and it has been for several years past and now is the policy of respondent to regard the permits as running with the plants and not the individual owners or operators, and this policy has been well publicized and is known to those engaged in the industry and to petitioners. Through experience respondent is reasonably certain that plants which were operated in the previous season will make use of the permits which are granted and issued for the following season.

That experience has also shown respondent that the plants which operated in the previous season are required to be dismantled from time to time for the purpose of making repairs, replacements, alterations and for overhauling during the period between fishing seasons, and that time and circumstances do not in every case allow such plants to be reassembled until after the final date set for the filing of applications for permits for the coming season. This condition does not exist in the case of new plants being constructed for the first time.

It further appears that the applications are granted or denied and the allocation of sardines is made well in advance of the season, but permits are not actually issued until shortly before the season starts, at which time, under rule G, all permittees alike, newcomers whose plants were completed on May 15 and the veterans of the industry, are penalized if for any reason they are not ready to operate on the first day of the season, by a proportionate reduction in the quantity of fish which they are allowed to process.

The limitations upon the power of courts to strike down classifications made for the purpose of regulation are well settled. In *Lindsley* v. *Natural Carbonic Gas Co.*, 220 U. S. 61, 78-79 [31 S.Ct. 337, 55 L.Ed. 369], the highest court stated them as follows:

"The rules by which this contention must be tested, as is shown by repeated decisions of this court, are these: 1. The equal protection clause of the Fourteenth Amendment does not take from the State the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis and therefore is purely arbi-

trary. 2. A classification having some reasonable basis does not offend against that clause merely because it is not made with mathematical nicety or because in practice it results in some inequality. 3. When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed. 4. One who assails the classification in such a law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary. *Bachtel* v. *Wilson,* 204 U.S. 36, 41 [27 S.Ct. 243, 51 L.Ed. 357] ; *Louisville & Nashville R. R. Co.* v. *Melton,* 218 U.S. 36 [30 S.Ct. 676, 54 L.Ed. 921] ; *Ozan Lumber Co.* v. *Union County Bank,* 207 U.S. 251, 256 [28 S.Ct. 89, 52 L.Ed. 195] ; *Munn* v. *Illinois,* 94 U.S. 113, 132 [24 L.Ed. 77] ; *Henderson Bridge Co.* v. *Henderson City,* 173 U.S. 592, 615 [19 S.Ct. 553, 43 L.Ed. 823].''

This court recently in *People* v. *Western Fruit Growers, supra,* 22 Cal.2d at page 507 said :

''When a legislative classification is questioned, if any state of facts reasonably can be conceived that would sustain it, there is a presumption of existence of that state of facts, and the burden of showing arbitrary action rests upon the one who assails the classification. (*In re Fuller,* 15 Cal.2d 425, 437 [102 P.2d 321] ; *McCreery* v. *McColgan,* 17 Cal.2d 555, 562 [110 P.2d 1051, 133 A.L.R. 800] ; *In re Livingston, supra* [10 Cal.2d 730 (76 P.2d 1192)] ; *Sequoia Nat. Park Stages Co.* v. *Sequoia & General Grant Nat. Parks Co.,* 210 Cal. 156 [291 P. 208] ; *Martin* v. *Superior Court, supra* [194 Cal. 93 (227 P. 762)] ; *In re Cardinal, supra* [170 Cal. 519 (150 P. 348, L.R.A. 1915F 850)] ; *County of Los Angeles* v. *Hurlbut,* 44 Cal.App.2d 88 [111 P.2d 963] ; *Pacific Gas & Elec. Co.* v. *Moore,* 37 Cal.App.2d 91 [98 P.2d 819].)''

The experience of the respondent commission as set out in its answers must be looked to and considered in determining whether the classification adopted has any reasonable basis in fact and we cannot say that the rules as interpreted and administered by the commission discriminate arbitrarily against the petitioners unless it is demonstrated to us that they find no supporting basis which might appeal to persons of reasonable mind.

The necessity of the permittees knowing long enough in advance the quantity of fish allocated to each so that they can make their contracts and arrangements for the coming season

is obvious. The respondent's practice of treating the permits as running to the plants and not to the operators guarantees that veterans without plants, because they have disposed of them or razed them or they have been otherwise destroyed, will not be granted permits for the coming season. We cannot say that the tolerance given to the veterans of the industry over the newcomers by rule B is not justified by the respondent's experience that old plants must be repaired and reconditioned between seasons. The sardine season ends in the north on February 15 and in the south on March 1. Any repairs and reconditioning of old plants cannot start until the season ends, and repairs and reconditioning might be impossible or impracticable between those dates and May 15, while perfectly feasible before the season starts on August 1. Newcomers to the industry on the other hand can commence construction of their plants at any time, and in ample time to be fully completed by the May 15 deadline.

The petitions contain no allegation that any applicant whose application was actually granted did not in fact have a plant ready for operation, but only that as to the 88 former permittees no investigation to ascertain the facts was made.

We cannot assume in the absence of any allegation on the subject that any of the veteran applicants did not in fact have completed plants on May 15. In the absence of an allegation to that effect we must, under the authorities cited, assume a state of facts which will make the regulation in its actual operation constitutional. "A statute may be invalid as applied to one state of facts, and yet valid as applied to another." (*Dahnke-Walker Milling Co.* v. *Bondurant*, 257 U.S. 282, 289 [42 S.Ct. 106, 66 L.Ed. 239].) Or as this court stated in *Max Factor & Co.* v. *Kunsman*, 5 Cal.2d 446, 468 [55 P.2d 177]:

"Respondent presents several hypothetical situations under which enforcement of the act would be inequitable or difficult, or, perhaps, even unconstitutional. It is elementary, of course, that a statute may be invalid as applied to one set of facts, yet valid as applied to another. (Citing *Dahnke-Walker Milling Co.* v. *Bondurant, supra.*) The situations conjured up by respondent are not here involved, and respondent is limited in his attack to the application of the statute to the factual situation now before the court." (Cf. *Wholesale T. Dealers Bureau* v. *National etc. Co.*, 11 Cal.2d 634, 661 [82 P.2d 3, 118 A.L.R. 486].)

The answer to petitioner's claim that under rule B the respondent might grant the application of a veteran who had no existing plant on May 15 is found in these authorities. So far as the pleadings show the supposition is purely hypothetical and under the facts pleaded that situation is not presented to us for determination.

So long as the allocation of fish is fairly made among the applicants who satisfy the rules, newcomers (of which apparently eleven this year qualified) and veterans of the industry being treated with equality in that respect, we can find no basis for holding the regulations capricious, unreasonable or arbitrary.

The Legislature has entrusted the supervision and protection of this valuable resource of the state to the respondent commission, not to the courts. The commission must be presumed to have a knowledge of the conditions which underlie and motivate its regulatory actions and unless it is demonstrated that those actions are not grounded upon any reasonable factual basis the courts should not interfere with the exercise of the discretion vested in it by the Legislature, nor lightly substitute their judgment for that of the commission.

Petitioners argue further that they have substantially complied with rule B, "being prevented from full compliance by causes beyond their control, viz: Labor disputes, and as a consequence it is an exceedingly harsh discrimination to deny them consideration altogether because of their failure to have a 100 per cent compliance with the rule." Similar apparent hardships are inherent in every classification made for the purpose of regulation. Some close cases must always fall just inside and others just outside of the line delimiting the class, wherever drawn, and the regulation will appear to operate with especial harshness upon those which happen to fall just inside. But the line must be drawn somewhere or there can be no classification and the courts have recognized that if the classification is reasonable in its over-all operation it is not to be stricken down because of its application to a particular case that may lie just inside its borders. Chief Justice Hughes said tersely in *Continental Baking Co.* v. *Woodring*, 286 U.S. 352, 370-371 [52 S.Ct. 595, 76 L.Ed. 1155]:

"It is obvious that the legislature in setting up such a zone would have to draw the line somewhere and unquestionably

it had a broad discretion as to where the line should be drawn.''

Justice Holmes in *Dominion Hotel* v. *Arizona,* 249 U.S. 265, 269 [39 S.Ct. 273, 63 L.Ed. 597], elaborated the same idea:

''If in its theory the distinction is justifiable, as for all that we know it is, the fact that some cases, including the plaintiff's, are very near to the line makes it none the worse. That is the inevitable result of drawing a line where the distinctions are distinctions of degree; and the constant business of the law is to draw such lines. 'Upholding the act as embodying a principle generally fair and doing as nearly equal justice as can be expected seems to import that if a particular case of hardship arises under it in its natural and ordinary application, that hardship must be borne as one of the imperfections of human things.' *Louisville & Nashville R. R. Co.* v. *Barber Asphalt Co.,* 197 U.S. 430, 434 [25 S.Ct. 466, 49 L.Ed. 819].''

*Cf. Zahn* v. *Board of Public Works,* 195 Cal. 497, 512 [234 P. 388], quoting *Brown* v. *City of Los Angeles,* 183 Cal. 783 [192 P. 716] ; *Martin* v. *Superior Court,* 194 Cal. 93, 105 [227 P. 762] ; *Matter of Application of Miller,* 162 Cal. 687, 699-700 [124 P. 427] ; *Matter of Petition of Burke,* 160 Cal. 300, 303-304 [116 P. 755].

The alternative writs of mandate heretofore issued are discharged and the petitions for peremptory writs denied.

Shenk, J., Edmonds, J., Traynor, J., and Spence, J., concurred.

CARTER, J.—I dissent.

The majority opinion in these cases sidesteps the issue of whether or not the rules of the commission are arbitrary and discriminatory by assuming facts and circumstances not justified by the record and then concludes that petitioners are complaining of a situation which in fact does not exist.

The rules of the commission must be taken as they read, and it must be presumed that the commission will and does enforce those rules in accordance with their plain terms. (Code Civ. Proc., § 1963(15).) Those rules provide that *a permit will be issued to an applicant holding a permit for the previous season regardless of whether he has a reduction*

*plant, or, if he has one, it is completed or equipped.* In other words, he need show *only one thing to obtain* a permit, that is, that he had a permit and operated in the previous season. He does not need to have operated for the entire prior season nor any substantial part thereof. He obtains a new permit without qualification, and, according to the plain terms of rule (G), the only penalty he suffers if his plant is not ready to operate at the opening of the season in August, is reduction in his allocation of sardines computed upon the total number of days in the season and the days he is not ready to operate. In the case of a *new applicant* (one who did not hold a permit in the previous season) he must have his plant fully constructed and equipped to receive and process fish on May 15th, 2½ months before the season opens. If he does not so qualify he is *refused a permit* rather than merely suffering the penalty imposed on the old applicant of a per diem reduction in his share of the sardines. Thus we have two instances in which the burden imposed upon the new applicant is vastly more onerous than that imposed on the old applicant: (1) The new applicant must have his plant ready 2½ months before the season opens while the old applicant need not have his plant ready until the opening of the season. (2) The new applicant gets no permit—is totally barred from operation during the season if he fails to comply. The old applicant merely suffers a per diem reduction in his share of the sardines.

Yet in the teeth of the positive requirements of the rule, statements to the contrary are made in the majority opinion. *These statements go entirely outside the record.* It is stated in said opinion that: ''Certain obvious differences exist between the applicant who has *successfully* operated under a permit allowing him to engage in the reduction of sardines in the previous season and the applicant who seeks to engage in that business for the first time.'' [Emphasis added.] There is no requirement in the rules that the old applicant must have *successfully* operated under a permit during the previous season. His permit may have been revoked during the season and he may have operated during only part of it and then unsuccessfully. *He is still entitled to a permit by reason of his having merely held a permit and operated ''in'' the prior season.* The statement is made that: Experience gained by respondent [commission] over a period of years has conclusively shown it that the applications of newcomers often have

been attempts to secure permits with plants more imaginary than real and that assurances on the part of bona fide new applicants that they will be able to complete their plants by the opening of the sardine season or shortly thereafter largely result in failures. Such conditions do not prevail in the case of plants which were operated in the previous season.'' How can the last statement be true when it is clear that no effort is made on May 15th to find whether the old applicants have plants? They are not required to have plants to obtain a permit. They may have sold the plants they had the previous season or they may be beyond repair. Yet having had permits for the prior season they will obtain permits for the instant season subject only to the per diem loss of their allocation of sardines if they are not ready on the first day of the season. The same criticism is applicable to the statement that ''respondent deems it inimical to public interest to permit trafficking in such permits by permittees who cannot themselves make use of them and to that end *has limited its permits to those who in fact have fully constructed and equipped reduction plants; . . .*'' [Emphasis added.] In applying its rules the commission has no assurance that the old applicants have completed reduction plants and even when they do not, they still receive a permit. It is also said that: ''The respondent's practice of treating the permit as running to the plants and not to the operators guarantees that veterans [not war veterans] without plants, because they have disposed of them or razed them or they have been otherwise destroyed, will not be granted permits for the coming season.'' and ''We cannot assume in the absence of any allegation on the subject that any of the veteran [not war veteran] applicants did not in fact have completed plants on May 15. In the absence of an allegation to that effect we must, under the authorities cited, assume a state of facts which will make the regulation in its actual operation constitutional.'' And ''The answer to petitioner's claim that under Rule B the respondent might grant the application of a veteran [not war veteran] who had no existing plant on May 15 is found in these authorities. So far as the pleadings show the supposition is purely hypothetical and under the facts pleaded that situation is not presented to us for determination.'' The rules do not permit of a denial of a permit to an old applicant even though he has no plant. It is not a question of whether we can assume that old appli-

cants may not have plants on May 15th. It is not hypothetical to assume that permits will be granted to old applicants regardless of whether they have a plant. Under the rules the sole requirement is a permit for the prior year. Hence it may not be supposed that an examination will be made to determine whether they have a plant on the application day, May 15th. Moreover it is specifically alleged by petitioners (in speaking of old applicants) that their applications are granted "without any inquiry as to whether or not they had plants capable of operating, or even sites on which to erect a plant, and without any inspection of any kind or character whatsoever, and solely upon the basis of the provisions of Rule G."

It must be plain therefore that the treatment of the old and new applicants is wholly different in the two respects above mentioned. To justify that discrimination the majority advances reasons (other than those above discussed which assume matters contrary to the record) as proper bases for classification: (1) That the applicant must know in advance of the opening of the season how many persons will receive permits thus enabling him to ascertain his quota and make his season's business commitments accordingly. That is nothing more than an argument in favor of requiring all plants to which permits are issued to be ready for operation some time before the season opens in order that there shall be some certainty in the number of plants that will operate and the bearing of that factor on the amount of the respective allocations of sardines. It deals with a matter not here in issue. Assuming that such a regulation is proper it applies to *all* applicants alike, whether new or old. To make real the advantage of before season certainty the old and new applicants should be treated similarly, otherwise the rule fails in its purpose. (2) It is asserted that the old applicants must have time to rehabilitate their plants after the end of the prior season and that they would not have time to do so if they are required to have a completed plant on May 15th; that such a condition does not prevail as to new applicants; and that hence a rational basis for discrimination exists. There may be some merit in that proposition insofar as it does not require the old applicant to have his plant ready *as far in advance as the new applicant.* Even that is doubtful. *But it furnishes no justification whatsoever for the increased penalty imposed on the new applicant. He gets no permit at all if his plant is not completed by May 15th*

*whereas the old applicant merely loses a portion of his alloca-*
*tion* if his plant is not ready for operation by August 1st.

It is clear that the factor that one applicant has been in business before is not a justifiable basis for imposing upon him less onerous regulations than those saddled upon a beginner. There is no rational or intrinsic difference between them which justifies the classification. In *In re Wacholder*, 1 Cal.App.2d 254 [36 P.2d 705], the ordinance required that to obtain a license to operate a florist business a bond must be given conditioned upon the applicant remaining in the business 180 days unless he had previously been in the business for 365 days. In denouncing the ordinance as discriminatory the court said: ''Here is a plain discrimination between the persons engaged in a like business made dependent upon the time in which they have been so engaged. . . . Again the section referred to is violative of the fourteenth amendment to the Constitution of the United States in that it imposes upon citizens who have not been in business in the city of Sacramento for 365 days, a burden not placed upon those who are already engaged in the business and have been so engaged for the period of 180 days. . . . Nor has the city council the power to impose a penalty upon one person transacting a like business with another person simply because person number one may not have been in business for quite so long a period as person number two. Such ordinances are neither police nor revenue measures, but are simply exclusive and discriminatory and under the constitutional provisions which we have referred to cannot be sustained.'' (Pp. 258-260.) *State* v. *Huse*, 187 Wash. 75 [59 P.2d 1101], involved a statute which prevented the issuance of licenses to take salmon to persons who had not previously had licenses. It was held (p. 1105 [59 P.2d]): ''A classification, to be legal and valid, must rest on real and substantial differences bearing a natural, reasonable, and just relation to the subject-matter of the act in respect to which the classification is made. The distinctions giving rise to the classification must be germane to the purposes contemplated by the particular law and may not rest upon a mere fortuitous characteristic or quality of persons, or upon personal designation. In short, the classification cannot be an arbitrary selection. These principles have been so frequently stated and so thoroughly recognized that it is unnecessary to cite any authority in their support.

''The classification made by section 4 of the act in question

can have no natural, reasonable, or just relation to the subject-matter of the act. If conservation be the end sought, it is not promoted by selecting a particular class of persons on an arbitrary basis and conferring special privileges on them and denying the same privileges to all others. Concededly, regulations might be prescribed which would tend to accomplish the desired result. But such regulations should not only apply to all persons equally, but should be of such nature as that all persons would at least have an equal chance to conform thereto. The provisions of the present act draw a line and erect a barrier which prevent all persons, except a chosen few, from ever crossing them, or from ever qualifying themselves for the privilege within the dispensation of the state. The selection rests upon mere accident or circumstance, and not upon conditions effecting a natural line of cleavage. We are of the opinion, and hold, that section 4 of the act, exclusive of the proviso, is unconstitutional and void.''

Rule B is clearly not a conservation measure, as the commission had previously fixed the total quantity of pilchard sardines which could be taken during the 1946-1947 season at 395,000 tons, and it is obvious that the number of permits granted would not affect the total take permitted.

In my opinion there is no reasonable or rational basis for the classification provided for in rule B and that such classification is so arbitrary, discriminatory and unfair as to render said rule void.

I would issue the peremptory writs of mandate prayed for by petitioners.

Schauer, J., concurred.