[Civ. No. 11100.   Third Dist.   July 20, 1965.]

JOHNSON RANCHO COUNTY WATER DISTRICT, Plaintiff and Appellant, v. STATE WATER RIGHTS BOARD, Defendant and Respondent; YUBA COUNTY WATER AGENCY, Real Party in Interest and Respondent.

864

Dolwig & Athearn, Richard J. Dolwig and Forden Athearn for Plaintiff and Appellant.

Thomas C. Lynch, Attorney General, Robert Burton and Seward L. Andrews, Deputy Attorneys General and Gavin Craig for Defendant and Respondent.

Alvin Landis for Real Party in Interest and Respondent.

FRIEDMAN, J.—Petitioner Johnson Rancho County Water District is a public entity located in Yuba County and formed in 1958 under the provisions of the "County Water District Law." (Wat. Code, §§ 30000 et seq.) Yuba County Water Agency, the real party in interest in this action, is a countywide public entity established by a special act of the Legislature in 1959 to develop and promote the use and regulation of the water resources of Yuba County.[1] (Cal. Stats. 1959, ch. 788, as amended; Wat. Code-App., ch. 84 [Deering's Wat. Code, Act 9407, §§ 1-28.].) These two agencies presented competing applications before the respondent State Water Rights Board seeking permits to appropriate major portions of the remaining unappropriated water of the Yuba River. Each application described a plan for development of a series of water storage and power facilities. Construction of both projects is not possible because of conflicts in the location of facilities.

After considering plans and supporting data plus testimony developed in eight days of hearing, the Water Rights Board on December 19, 1963, filed a decision approving the Yuba Agency project, granting its water rights applications (subject to minor limitations) and denying the applications of Johnson Rancho. On February 17, 1964, the board denied Johnson Rancho's petition for reconsideration. The latter commenced a mandate action in the Superior Court of Nevada County seeking judicial review of the Water Rights Board's action. The trial court's review resulted in its re-

---

[1]For convenience we shall refer to petitioner as "Johnson Rancho" and to the real party in interest as "Yuba Agency." All section references in this opinion are to the Water Code unless otherwise noted.

fusal to disturb the board's decision and in denial of the writ of mandate. Johnson Rancho appeals. The State Water Rights Board has filed a brief in its role as respondent and the Yuba Agency a separate brief as real party in interest.

The parties are in apparent agreement that Code of Civil Procedure section 1094.5[2] governs judicial review of Water Rights Board actions on applications for water appropriation. (*Temescal Water Co.* v. *Department of Public Works,* 44 Cal.2d 90, 106 [280 P.2d 1].) They also seem to agree that the reviewing court is not to reweigh the evidence but to determine, from the evidence before the board, whether the findings of the board are supported "by substantial evidence in the light of the whole record." (Code Civ. Proc., § 1094.5, subd. (c); see *Southern Cal. Jockey Club, Inc.* v. *California Horse Racing Board,* 36 Cal.2d 167, 174-175 [223 P.2d 1].) Nevertheless, the trial court findings recite that the findings of the Water Rights Board are supported by the weight of the evidence.

The decision of the Water Rights Board sets out condensed descriptions of the respective projects. The Johnson Rancho plan is described as follows: "The revised plan contemplates the construction of the Indian Valley Reservoir of 282,000 acre-foot capacity on the North Yuba River, an 825,000 acre-foot capacity Parks Bar Reservoir on the main stem of the Yuba River, and a 200,000 acre-foot capacity Waldo Reservoir for off-stream storage on Dry Creek. Water is to be released from the Indian Valley Reservoir through the Indian Valley Power Plant located at the downstream toe of the dam, thence into New Bullards Bar Reservoir for release through New Bullards Bar and New Colgate Power Plants to P.G.&E.'s Englebright Reservoir. Water will be either re-

---

[2]Code of Civil Procedure section 1094.5 provides in part as follows:

"(b) The inquiry in such a case shall extend to the questions whether the respondent has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order of decision is not supported by the findings, or the findings are not supported by the evidence.

"(c) Where it is claimed that the findings are not supported by the evidence, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence; and in all other cases abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record."

leased from Engelbright Reservoir directly into the proposed Parks Bar Reservoir, thence through Parks Bar Power Plant, or through a proposed Smartsville conduit system which will either take the water to a penstock leading into the Parks Bar Power Plant or to storage in the proposed Waldo Reservoir. Consumptive use of water will be within the Wheatland Water District, Johnson Rancho District and adjacent areas, and on lands in Butte, Sutter, Nevada and Placer Counties, and on an undesignated 1,000,000 acres on the valley floor of the Sacramento and San Joaquin Rivers.''

In support of its application the Yuba Agency submitted a plan described as follows: ''Yuba proposes to construct a diversion dam, referred to as Hour House, on the Middle Yuba River, which will divert water through the Lohman Ridge Tunnel to Oregon Creek. Immediately below the outlet of this tunnel, water will be diverted from Oregon Creek by the Log Cabin Diversion Dam through a proposed Camptonville Tunnel to Willow Creek which enters the North Yuba River upstream from a proposed new Bullards Bar Dam. This dam is to be located on North Yuba River approximately 1.5 miles downstream from the existing Bullards Bar Dam of Pacific Gas and Electric Company (hereinafter referred to as 'P.G. & E.'), which will be inundated. The reservoir formed by this dam will have a gross capacity of 930,000 acre-feet. A two-unit New Bullards Bar Power Plant with a capacity of 132,000 kilowatts will be located at the downstream toe of the dam.

''New Bullards Bar Dam will be a rock-fill or concrete-arch structure. If it is to be rock-fill, the fill material will cover the site of P.G. & E's Colgate Dam and the intake works of an existing power tunnel. This will necessitate the construction of a new dam approximately 2,700 feet downstream from the axis of the New Bullards Bar Dam, along with 3,000 feet of new tunnel to link the forebay formed by the new dam and the existing P.G. & E. tunnel. A New Colgate Tunnel, 22,400 feet in length with a capacity of 3,800 cfs, will be constructed with an intake immediately upstream from the New Colgate Dam to connect with a 2,300 foot penstock to a proposed New Colgate Power Plant. If New Bullards Bar Dam is to be a concrete-arch structure, existing Colgate Diversion Dam will create a forebay for the existing tunnel of P.G. & E., as well as the New Colgate Tunnel. The New

Colgate Power Plant will be located on the north bank of the Yuba River approximately 600 feet downstream from P.G. & E.'s existing Colgate Power Plant and will have a total installed capacity of 122,000 kw.

"An existing Narrows Dam which creates Englebright Reservoir is located approximately nine miles downstream from the Colgate Power Plant and six miles from the confluence of the South Yuba River and the Yuba River. Water will be conveyed from Englebright Reservoir to a proposed New Narrows Power Plant which will be a 41,000-kw. installation. The proposed Timbuctoo Afterbay Dam will be located approximately two and one-half miles downstream from the Narrows Power Plants. It will have a gross storage capacity of 5,700 acre-feet and will furnish regulatory storage for the purpose of serving Yuba's proposed North and South Canals and the existing canals of the Hallwood Irrigation Company and the Cordua Irrigation District. An Irrigation Diversion Weir will divert water into proposed North Yuba and South Yuba Canals to serve lands within Yuba County."

During the course of the board's hearings Johnson Rancho submitted a compromise proposal calling for joint development of projects along the river by both agencies. The board's decision describes the compromise proposal as follows: "Under this proposal for joint development, Yuba would construct Hour House and Log Cabin Diversion Dams, Lohman Ridge and Camptonville Tunnels, New Bullards Bar Dam and Reservoir, and the New Bullards Bar and New Colgate Power Plants. Johnson Rancho would construct a 320,000 acre-foot, first-stage Parks Bar Dam and Reservoir and Parks Bar Power Plant, along with what is described as a 'small Waldo Project.' "

The appeal of Johnson Rancho poses a series of objections, legal and factual, to the findings and award of the State Water Rights Board.

### Conformity with California Water Plan

Primary focus of Johnson Rancho's attack is an alleged conflict between the Yuba Agency's development program and one feature of the California Water Plan. The California Water Plan was the result of studies conducted by the California Department of Water Resources. It was published in the department's Bulletin No. 3 in 1957. It listed

for possible development 376 dams and reservoirs, plus related facilities, on various rivers and streams throughout the state. The 1959 Legislature gave statutory recognition to the California Water Plan.[3] A site on the main stem of the Yuba River called "Parks Bar" was the location of one of the 376 proposed dams listed in the plan.[4]

[3]Three sections of the Water Code enacted by California Statutes of 1959, chapter 2053, are as follows: "In determining public interest under Sections 1253 and 1255, the board shall give consideration to any general or coordinated plan looking toward the control, protection, development, utilization, and conservation of the water resources of the State, including The California Water Plan, prepared and published by the Department of Water Resources or any predecessor thereof and any modification thereto as may be adopted by the department or as may be adopted by the Legislature by concurrent resolution or by law." (Wat. Code, § 1256.)

"The plan for the orderly and co-ordinated control, protection, conservation, development, and utilization of the water resources of the State which is set forth and described in Bulletin No. 1 of the State Water Resources Board entitled 'Water Resources of California,' Bulletin No. 2 of the State Water Resources Board entitled, 'Water Utilization and Requirements of California,' and Bulletin No. 3 of the Department of Water Resources entitled, 'The California Water Plan,' with such amendments, supplements and additions as may be later necessary, shall be known as 'The California Water Plan.' The Department of Water Resources shall, from time to time, adopt such amendments, supplements and additions to the plan as it finds necessary and desirable, which amendments, supplements and additions shall become effective when reported to the Legislature at any session thereof. The Legislature may also adopt, from time to time, any amendments, supplements and additions to the plan that it finds necessary or desirable, which amendments, supplements or additions may be adopted by concurrent resolution or by law." (Wat. Code, § 10004.)

"It is hereby declared that the people of the State have a primary interest in the orderly and co-ordinated control, protection, conservation, development, and utilization of the water resources of the State by all individuals and entities and that it is the policy of the State that The California Water Plan, with such amendments, supplements and additions thereto as may be necessary from time to time, is accepted as the guide for the orderly aned co-ordinated control, protection, conservation, development, and utilization of the water resources of the State. This declaration does not constitute approval of specific projects or routes for transfer of water for construction by the State or for financial assistance by the State without further legislative action, nor shall this declaration be construed as a prohibition of the development of the water resources of the State by any entity." (Wat. Code, § 10005.)

[4]As published in 1957 the plan (Bull. No. 3, pp. 110-112) stated: "Foothill development of the Yuba River would consist of Parks Bar Reservoir below Englebright Dam for flood control, and Waldo Reservoir, on Dry Creek, a tributary of Bear River, to provide off-stream storage for surplus Yuba River water. . . .

". . . [A]bout 40,000 kilowatts and 83,000,000 kilowatt-hours are considered to be creditable to the Parks Bar Power Plant, a feature of the California Aqueduct System. This takes into account the loss of

One component of Johnson Rancho's plan for development of the Yuba River was a dam and 825,000 acre-foot reservoir at Parks Bar. Upstream from Parks Bar is the Narrows Dam, an existing Pacific Gas and Electric Company facility, which creates Englebright Reservoir. A reservoir created by construction of the dam at Parks Bar proposed by Johnson Rancho would inundate the Narrows Dam facility. The Yuba Agency proposal, on the other hand, would utilize the existing Narrows Dam facility by conveying water from Englebright Reservoir to a proposed New Narrows Power Plant. Resting as it does on the preservation of power facilities and stored water at Narrows Dam, Yuba Agency's plan implicitly prevents future development of the Parks Bar facility described in the 1957 California Water Plan.

In contending that the Water Rights Board was legally powerless to award permits based upon a development which precluded construction of the Parks Bar Dam, petitioner misconstrues the plan and misconceives the Legislature's purpose in giving it statutory sanction. At a multitude of points throughout its 26-page introduction and 246 pages of text, Bulletin No. 3 evinces the general, tentative and flexible character of the plan. In its introductory section, a communication from a board of engineering consultants endorses the recommendation of the Director of Water Resources that there be more detailed study of component features of the plan to determine their need, engineering feasibility and financial feasibility and that the plan be subject to continuing review, modification and improvement in the light of changing conditions and additional information. The engineering consultants recommend that the Legislature receive the plan as a coordinated proposal for the progressive and comprehensive future development of the state's water resources, but that no specific project be authorized for construction without detailed investigation of engineering feasibility, economic justification and financial feasibility. (Bull. No. 3, p. xv.) It warned that the plan, as presented in Bulletin No. 3, includes "projects of doubtful economic justification and works of unproven physical feasibility." (*Ibid.*, p. xv.) The department's introductory section states that the magnitude of the investigation prevented economic and financial anal-

power at the upstream Narrows Power Plant, which eventually would be abandoned due to submergence by Parks Bar Reservoir.''

yses. (*Ibid.*, p. xxv.) It states that ". . . the Plan must be regarded as no more than a broad and flexible pattern into which future definite projects may be integrated in an orderly fashion." (P. xxv.) The plan states that "Further investigation may indicate alternative projects which are more feasible than those discussed herein. . . ." (*Ibid.*, p. 7.) At the head of numerous tables listing individual projects, appears the statement in black-face type: "These works show future development possibilities. They are not project proposals." (*Ibid.*, pp. 50, 63, 77, 92, 120, 146, 158, 170, 176, 183, 190, 196, 204.)

In giving statutory sanction to the plan, the 1959 Legislature expressed itself in the same general and tentative fashion. Section 1256 tells the Water Rights Board that in determining the public interest involved in water rights applications, it "shall give consideration to any general or coordinated plan . . . including The California Water Plan . . . and any modification thereto. . . ." Section 10004 envisions the continuing amendment and supplementation of the plan. Notably, it permits but does not require legislative approval of amendments and modifications; rather, the simple act of a departmental report to the Legislature while it is in session suffices to effect a change in the plan. Section 10005 declares a state policy that the plan, with its amendments and supplements, is acknowledged as "the guide" to the conservation and development of the state's water resources. As though out of an abundance of care, section 10005 states: "This declaration does not constitute approval of specific projects. . . ." These provisions are quoted in full in footnote 3, *supra.*

Thus, without the slightest ambiguity, both the Legislature and the Department of Water Resources announced that the 1957 water plan was general and flexible and specific projects entirely tentative. Even so, petitioner maintains that the Water Rights Board could not eliminate a specific project unless it was first eliminated by modification of the plan. To the contrary, section 1256 directs the board only to "give consideration" to the plan. The direction to consider does no more than command the board to hold in mind and pay regard to the plan and its projects in passing on water rights applications. Having paid that regard, the board may accept or reject a specific project. It is not foreclosed from rejecting an individual project which, on close examination, turns out

to be financially unfeasible or physically ill-matched with an integrated series of facilities looking to the development of an entire watershed. The soft language of section 1256 falls far short of the stringency urged by petitioner. The decision of the Water Rights Board in this case demonstrates that the board did indeed give consideration to the Parks Bar project.[5] The board did not violate its statutory duties in awarding appropriative water rights for an integrated water development which precluded construction of a specific project enumerated in the California Water Plan.

There is a second and equally compelling reason for rejecting petitioner's complaint of elimination of the Parks Bar Reservoir. On February 18, 1964, after the Water Rights Board's decision of December 19, 1963, and shortly before Johnson Rancho commenced the present lawsuit, the Department of Water Resources filed its Bulletin No. 115 with

---

[5]After describing Johnson Rancho's alternative proposal for joint development by the two agencies, the decision of the Water Rights Board states:

''The normal high water level of Johnson Rancho's Parks Bar Reservoir would be approximately 200 feet higher than the elevation of Yuba's proposed New Narrows Power Plant and would necessitate elimination of this power facility as well as P.G. & E.'s existing Narrows Power Plant.

''Yuba contends that elimination of the New Narrows portion of its project would make its project infeasible and for that reason, along with others, is not agreeable to the proposal. It further contends that the overall joint project would be infeasible and that Johnson Rancho's Parks Bar Dam and Power Plant taken alone would be 50 per cent short of financial feasibility. Johnson Rancho did not submit a project operation study to substantiate the feasibility of such a joint project.

''Johnson Rancho is within the proposed service area of Yuba, and its expressed interest in constructing a project is to accomplish a higher degree of flood protection and development of the waters of the Yuba River system than that offered by Yuba's project, in the public interest. In this regard the State Department of Water Resources has been conducting a comprehensive investigation leading to full development of the water resources of Yuba Basin which was commenced in the year 1957 and which is now in its final phase (DWR Exh. 11). The Department considers Yuba's project a satisfactory initial stage of an overall development which will accomplish the maximum development of the waters of the entire stream system. The second stage of the development will include a 1,000,000 acre-foot Marysville Reservoir approximately five miles downstream from the Parks Bar damsite.

'' .  .  .  .  .  .  .  .  .  .

''Johnson Rancho estimated that from 230,000 to 260,000 acre-feet of storage at a first-stage Parks Bar Reservoir would be available for flood control purposes (RT 746). No operation study was presented to establish the financial feasibility of such a reservation (RT 746). No opinion was given as to flood control benefit of a second-stage Parks Bar Reservoir; and no further investigation is planned by this applicant 'until the question of the Narrows Project is settled.' (RT 752).''

the Legislature, which was then in session. We take judicial notice of the bulletin and its contents. (Code Civ. Proc., § 1875, subd. 3.) Bulletin No. 115 was a restudy of proposed development of the water resources of the Yuba and Bear Rivers Basin. Pertinent here are portions of the bulletin which modified the California Water Plan by eliminating the Parks Bar Reservoir (so strongly urged by petitioner) and proposed a downstream Marysville Dam and Reservoir, a unit which had not been included in the 1957 Plan.[6]

In a case such as the present the appellate court disposes of the matter in conformity with the law existing at the time of its decision. (*Tulare Irrigation Dist.* v. *Lindsay-*

---

[6]The following are excerpts of Bulletin No. 115 evincing the department's modification of this phase of the California Water Plan: "More detailed studies of the Bulletin No. 3 plan conducted during the course of this investigation resulted in several modifications to the plan. . . ." (P. 150.)

"As planning studies and comparisons of alternatives progressed, it became evident that a dual reservoir project, consisting of (1) an upstream New Bullards Bar Reservoir with feeder diversions from the Middle Yuba River and Oregon Creek and associated power generation facilities, and (2) downstream storage unit, would afford the most advantageous and economical water development. Alternative units for downstream storage would consist of (1) a Marysville Dam and Reservoir, or (2) a large Parks Bar Dam and Reservoir.

"Either of these dual reservoir projects would conserve and develop new water supplies, develop the hydroelectric power potential of the Yuba River below New Bullards Bar Reservoir, provide for the control of floods, and enhance the recreation and fisheries potential of the area.

"The Marysville site permits the development of a reservoir with a larger storage capacity than that available at the Parks Bar-Dry Creek site. The greater carry-over storage capacity, and the marginal feasibility of a dependable power installation below the dam due to the low average head available, would make possible the release of large quantities of water on a variable schedule to firm up the export supply from the Delta.

"The Parks Bar Unit would include a powerplant at the base of the dam and would thereby further develop the power potential. As a consequence of release requirements for firm power generation, together with a smaller active storage capacity than the proposed Marysville Reservoir, no new water for export from the Delta would be realized." (Pp. 152-153.)

"The plan for initial development formulated for the [Yuba County Water] agency was essentially the same as the New Bullards Bar Unit of the lower Yuba River Project advocated by the State.

"Subsequent studies conducted by the department and Yuba County Water Agency resulted in the following conclusions: . . . (3) The additional hydroelectric power developed below Englebright Dam is necessary to support local project financing from revenue bonds.

"The New Bullards Bar-Marysville Project is considered to be the most practical multipurpose plan to maximize the development and utilization of the water resources of the lower Yuba River. . . ." (Pp. 154-155.)

*Strathmore Irrigation Dist.*, 3 Cal.2d 489, 526-530 [45 P.2d 972].) ▊ Even if the Water Rights Board's decision violated its statutory obligations as shaped by the California Water Plan as the latter stood on the date of that decision, it would be ridiculous to return this proceeding to the board for reconsideration by a new standard which completely sanctions the decision actually reached. The elimination of the Parks Bar Project is in unquestionable conformity with the present Plan.

A legislative action which occurred following the Water Rights Board decision is worthy of note. In its first extraordinary session of 1964 the Legislature adopted a bill authorizing a $10,000,000 loan of state funds to the Yuba Agency in order to finance the early construction stages of its Yuba River project, the loan to be repaid out of expected federal flood control funds. (Stats. 1965, First Ex. Sess. 1964, ch. 41.) The bill was approved by the Governor on April 27, 1964. While possibly available as a ratification of the board decision of December 19, 1963, the ratification point is superfluous since the board's decision, as we have held, satisfied its obligation to consider the California Water Plan.

### Adequacy of Findings and Evidence

"Public interest" is the primary statutory standard guiding the Water Rights Board in acting upon applications to appropriate water. (§§ 1253-1256.) The board is to consider the variety of beneficial uses which the particular water may serve and may subject the appropriation to conditions which will best develop and conserve the water in the public interest. (§ 1257.)

▊ Johnson Rancho attacks the board's findings, urging that the board did not "expressly" find a public interest in the grant of a permit to the Yuba Agency. Especially it claims that the board failed to find whether the Yuba Agency project will put the river to fullest beneficial use and whether it is more or less expensive than Johnson Rancho's plan.

▊ The findings of the Water Rights Board need not be stated with the formality required in a judicial proceeding; "their basic purpose is to enable the reviewing court to determine whether they are supported by sufficient evidence or a proper principle and to apprise the parties as to the reason for the administrative action in order that they may decide whether, and upon what grounds, additional proceedings should be initiated." (*Temescal Water Co.* v. *Department of Public Works, supra,* 44 Cal.2d at p. 102.)

In its December 19, 1963, decision the board described the Yuba Agency proposal, the Johnson Rancho proposal, and the joint plan proposed by the latter. It described the availability of unappropriated water; discussed the power revenues expected from the Yuba Agency project; stated that Yuba's proposal would be financially feasible provided that revenue bond interest could be kept at a certain rate; stated that Johnson Rancho had not submitted similar financial data; mentioned existing power sale commitments in Yuba Agency's hands and compared the revenue expectations of Johnson Rancho;[7] compared the flood control, recreational and fishery features of both plans; compared the respective ability of each applicant "to proceed with diligence;" stated that the Yuba Agency had submitted a definite construction schedule, while Johnson Rancho had no final plans and had not completed studies to determine power and water yields nor indicated how it would finance such studies. In a section entitled "Conclusions," but which were really the board's ultimate findings of fact, the board stated with reference to the Yuba Agency project:

"1. The revenue from the power features of Yuba's [Agency's] project including the New Narrows facility together with other available funds are adequate to meet expected costs of construction of the project.

"2. Yuba's [Agency's] project will provide a significant measure of flood control as well as make water available for necessary multi-purpose uses and *will be consistent with other plans by the State and Federal Governments for the ultimate full development of the Yuba River.*

---

[7] In this regard the board's decision states: "Johnson Rancho has approximately 800 acres of land subject to irrigation within its boundaries requiring an estimated 4,000 acre-feet a year, which is approximately 0.3 of 1 per cent of the total yield of its proposed project (RT 927-928). There are only two families and six voters in the district (RT 616). It contemplates service to other areas within Yuba County which Yuba also proposes to serve (RT 916). However, there have been no indications from any water users within this larger local area that they wish to be served by Johnson Rancho. The principal area which Johnson Rancho proposes to serve is an indefinite 1,000,000 acres on the valley floor of the Sacramento and San Joaquin Rivers (RT 886). No definite information was submitted as to the requirements or the particular places of use within this general area (RT 807). Service to this area would necessitate the use of the State's aqueduct system or the Bureau of Reclamation facilities. No agreement has been reached, and no negotiations are in process for the use of either of these facilities (RT 941). In addition, there has been no definite written expression of an intention to purchase water from Johnson Rancho by any user in this general area (RT 909-910)."

"3. There is unappropriated water available to supply Yuba [Agency] except for consumptive purposes during the months of July and August, and subject to suitable conditions, such water may be diverted and used in the manner proposed without causing substantial injury to any lawful user of water.

"4. Yuba [Agency] has shown that it can reasonably be expected to commence construction of its project promptly and to proceed with due diligence in placing the water to be appropriated to beneficial use and that *approval of its applications would be in the public interest.*" (Italics added.)

With respect to Johnson Rancho the "Conclusions" state:

"6. Johnson Rancho has failed to show the financial feasibility of either its project or the joint project proposed by it, or that it is able to construct its project and place water to beneficial use in the manner described in its applications.

". . . that approval of applications 15560, 15585, 15656, 15700, 15873, 15930, 15944, and 15945 of Johnson Rancho would not be in the public interest, and these applications should be denied in their entirety."

In view of the board's conclusions (really findings) the argument that the board did not "expressly" find on the public interest factor is nothing but a quibble. The board found that Yuba Agency had demonstrated a public interest, that Johnson Rancho had not. The remaining recitals and conclusions are simply evidentiary auxiliaries to this finding of ultimate fact. The language employed by the board amply evinces a factual judgment on the criterion of public interest established by Water Code sections 1253-1257. The board's decision likewise satisfies the criteria for administrative findings enunciated in the *Temescal Water Co.* case, *supra.*

Johnson Rancho attacks the evidentiary basis for these findings. The Legislature has entrusted the allocation of the state's uncommitted water resources to the Water Rights Board, not to the courts. Unless it can be demonstrated that the board's actions are not grounded upon any reasonable factual basis the courts should not interfere with its discretion or substitute their discretion for that of the board. (*Ferrante* v. *Fish & Game Com.,* 29 Cal.2d 365, 374 [175 P.2d 222]; see *Temescal Water Co.* v. *Department of Public Works, supra,* 44 Cal.2d at p. 102.)

The record of the administrative hearing shows that

Yuba Agency's plan was the initial part of a two-stage project, the second stage of which would include a Marysville Dam and a 1,000,000 acre-foot reservoir approximately 5 miles downstream from the Parks Bar damsite. The Marysville Reservoir had not been included in the 1957 California Water Plan. (As indicated above, Bulletin No. 115 later amended the California Water Plan to include the Marysville Reservoir.) Basically, the Yuba Agency proposed development of the Yuba River through a combination of water storage facilities at New Bullards Bar and Marysville Dam, while Johnson Rancho's plan was based upon a New Bullards Bar-Parks Bar combination. The public interest standard required the board to weigh not only the comparative virtues of the competing projects but also the comparative ability of the sponsoring parties to finance their projects, to move from planning into actual construction and completion and to market water and power to provide revenue for bond payments. Petitioner's evidentiary argument consists of nothing more than an attack on the engineering and financial features of Yuba Agency's project, coupled with praise for its own project and an assertion of its own ability to proceed from plan into actuality. Such an argument falls far short of demonstrating a lack of substantial evidence. The evidentiary recitals in the board's decision catalog the engineering and financial features of Yuba Agency's proposal in terms of utilization of water and flood control and describe Yuba Agency's ability to translate its proposals into actuality. Petitioner does not contend, let alone demonstrate, that these evidentiary recitals are untrue. There is no lack of substantial evidence to support the finding of a public interest in the Yuba Agency proposal.

The evidentiary recitals also make it clear that major factors in the board's decision were the less advanced stage of Johnson Rancho's planning, its professed need for future studies, the deficiencies in its financial feasibility data, its lack of readiness to proceed with actual financing and construction and the cloudy character of its revenue expectations. Quite aside from the abstract virtues of Johnson Rancho's project proposals, these factors constituted substantial evidence that its proposed appropriation was not in the public interest.[8]

[8]Water Code section 1255 provides: "The board shall reject an application when in its judgment the proposed appropriation would not best conserve the public interest."

██ We reject the contention that the board was required to make an express finding that the approved project would put the river to the fullest possible beneficial use or that one project was more or less expensive than its competitor. In view of the important role played by an appraisal of the applicant's financial capacity and readiness to proceed, such findings would not be completely determinative. There is no demand in the law for express findings in the form urged by petitioner. Rather, the questions of fullest beneficial use and comparative expense are important evidentiary issues which contribute, one way or the other, to the ultimate issue of public interest.

### Validity of Yuba Agency's Water Rights Applications and Amendments Thereto

Of Yuba Agency's six applications to appropriate water, two (Nos. 5631 and 5632) had been assigned to it by the California Water Commission. These applications had originally been filed by the Department of Finance pursuant to the Feigenbaum Act (Cal. Stats. 1927, ch. 286[9]), which directed the department to "make and file an application or applications for any water or the use thereof which in the judgment of the state department of finance is or may be required in the development and completion of the whole or any part of a general or coordinated plan looking towards the development, utilization or conservation of the water resources of the state." Sections 10504 and 10504.1 authorize the California Water Commission, after notice and hearing, to assign such applications when the assignment is "for the purpose of development not in conflict with such general or co-ordinated plan." Johnson Rancho asserts that the assignments are void because they contemplate a development which conflicts with the California Water Plan in precluding use of the proposed damsite at Parks Bar.

The argument is essentially a repetition of that considered earlier in this opinion and is rejected for the same reasons.

██ The assignments recite that Yuba Agency ". . . proposes to construct and operate a water and power development project in the Yuba River Basin consisting of a New Bullards Bar Dam and Reservoir and associated power and

---

[9]This act, as amended, is now codified as Water Code sections 10500-10507. Language similar to that quoted *infra* is contained in section 10500.

irrigation facilities." Petitioner urges that the assignments are void because they fail to show the "purpose of development" in conformity with section 10504. There is nothing in the Water Code specifying the form of such assignments. The briefs of respondent and real party in interest point out, and petitioner's closing brief does not deny, that the latter participated in contested assignment hearings before the California Water Commission and at one point filed a lawsuit in an attempt to nullify the assignments. Under these circumstances it is impossible to discern any prejudice which Johnson Rancho may have suffered by reason of the form of the assignments.

▮ Johnson Rancho further contends that amendments made to the other four applications filed by the Yuba Agency (Nos. 15204, 15205, 15603, 15574) are void because rule 738 (Cal. Admin. Code, tit. 23, § 738) of the board requires the petitioner for such an amendment to show "that the allowance of the proposed change will neither in effect constitute the initiation of a new right nor operate to the injury of any other appropriator or lawful user of water." It is asserted that the amendments initiate a new right because they change the location of certain storage areas and eliminate others. The Water Rights Board argues that "a change in place of storage (point of diversion) may be made within the scope of an existing application so long as the quantity of water applied for is not increased. If the change involved the appropriation of more water or taking water from a different river system, the rule against the initiation of a new right would apply to prevent the change." Johnson Rancho does not contend that the amendments allowed the appropriation of an increased amount of water. The board's interpretation is consistent with a commonsense view of the Water Code provisions on assignment.

The four applications last mentioned had originally been filed by Yuba County. The Yuba Agency pursued these applications before the Water Rights Board as assignee of the county. At the hearing before the board Johnson Rancho claimed that Yuba County had originally filed these applications in trust for the Wheatland Water District, which had in turn transferred its interest in these applications to Johnson Rancho. At the time it made these contentions before the Water Rights Board, Johnson Rancho had a lawsuit pending against Yuba County and the Yuba Agency to establish its

ownership on these applications. In view of this pending lawsuit and in view of its own rules,[10] the board refused to determine this question of title, regarding it as a judicial matter which should be left to the courts. The lawsuit eventually wound up in this court, where it terminated unfavorably to Johnson Rancho because the written agreement alleged as the basis of ownership had nothing to do with the water rights in suit and Johnson Rancho was able to produce no other document. (*Johnson Rancho County Water Dist.* v. *County of Yuba,* 223 Cal.App.2d 681 [35 Cal.Rptr. 828].)

Johnson Rancho now asserts that the Water Rights Board erred in refusing to entertain evidence of its ownership of these four applications. We certainly do not propose to remand this proceeding to the Water Rights Board for determination of a claim which had been fruitlessly pressed in the courts. Although the judgment in *Johnson Rancho County Water Dist.* v. *County of Yuba, supra,* was one rendered following the sustaining of a demurrer, it was reached because the plaintiff effectually confessed that it could not demonstrate its ownership. The circumstances of that suit were such as to make the judgment one on the merits. It is therefore res adjudicata. Johnson Rancho will not be heard to litigate the question anew. (See *DeMonbrun* v. *Sheet Metal etc. Assn.,* 140 Cal.App.2d 546, 554-555 [295 P.2d 881]; 29 Cal.Jur.2d, Judgments, § 234.)

Petitioner has failed to demonstrate error on the part of the State Water Rights Board or on the part of the lower court in denying its application for a writ of mandate. The judgment is therefore affirmed.

Pierce, P. J., and Regan, J., concurred.

---

[10]Title 23, California Administrative Code, section 767, provides: "The board will not undertake to determine contests as to ownership of rights initiated by applications to appropriate water, its only concern being to maintain such a record of ownership as will facilitate communication with owners when necessity demands. The board will ordinarily accept any claim which is asserted to ownership of an application, permit or license unless the record title holder, or an asserted successor in interest, objects. When a contest develops as to ownership the board will not ordinarily change its record until the matter is either determined by a court or adjusted to the mutual satisfaction of the parties, unless evidence of continued occupation, use, or control justifies a different course."