[Civ. No. 14001. Third Dist. Oct. 1, 1974.]

BANK OF AMERICA, as Corporate Co-trustee, etc.,
Plaintiff and Appellant, v.
STATE WATER RESOURCES CONTROL BOARD,
Defendant and Respondent.

200

## COUNSEL

Daniel F. Gallery for Plaintiff and Appellant.

Evelle J. Younger, Attorney General, Carl Boronkay, Assistant Attorney General, and John Morris, Deputy Attorney General, for Defendant and Respondent.

## OPINION

**RICHARDSON, P. J.**—Bank of America (hereinafter "Bank") appeals following judgment dismissing its petition filed under Code of Civil Procedure section 1094.5, for writ of mandate against State Water Resources Control Board (hereinafter "Board"). The petition before us initially challenged the validity of two conditions which the Board attached to its decision granting Bank's application to appropriate water. The parties having resolved their disagreement as to one of the conditions, Bank, accordingly, has abandoned its attack as to it. The remaining condition, focal point of our inquiry, was designated as condition 11, and requires public access to certain reservoirs on the Bank's property.

Bank's contentions are: (1) the trial court incorrectly held that substantial evidence exists in the record supporting the imposition of the challenged condition number 11; (2) the Board acted in excess of its jurisdiction in imposing condition 11; and (3) the trial court applied an improper standard of review.

We will conclude that the trial court applied the proper standard of review. We conclude further that the Board has the jurisdiction to condition an appropriation permit on public access to the water so appropriated, but that the record herein lacks substantial evidence in support of the imposition of the condition.

### FACTS

Bank is corporate co-trustee of the Pension Trust Fund for Operating Engineers, a fund established to provide pension benefits for employees

represented by Operating Engineers Local Union No. 3. As such trustee, Bank owns approximately 3,500 acres of land in eastern Sacramento County on both sides of the Cosumnes River. This property, commonly known as Rancho Murieta, was purchased by the fund for the purposes of investment and use by the union as a center for the training and re-training of apprentices, preapprentices, and journeymen operating engineers. In furtherance of the investment purpose, a land use plan was prepared and approved by the County of Sacramento (hereinafter "County") for the development of Rancho Murieta. The general plan adopted by County envisions an eventual population of 25,000 in 18 to 22 years. The first phase of construction, the training facilities building, had been completed at the time of the hearings hereinafter described.

In the course of planning for the water supply of Rancho Murieta, Bank filed with the Board application No. 23416 for the appropriation from the Cosumnes River of six cubic feet of water per second (cfs), plus 3,900 acre feet per annum (afa) of water, for irrigation, municipal, recreational and industrial purposes. The proposed appropriation constitutes Rancho Murieta's principal water source. Additionally, Bank filed applications No. 23417, 23418 and 23419 for appropriation, respectively, of lesser volumes of water from certain unnamed streams flowing through its property. These applications proposed that this latter volume of water be diverted and stored for recreation and stock watering purposes in three small reservoirs called Laguna Joaquin, Peralta, and Clementia (or Chemeketa). Both the unnamed streams and the three reservoirs are located on Bank's property. Application 23416 drew several protests, among them one from the California Department of Fish and Game (hereinafter "Fish & Game"). By the time of the Board's hearing all but Fish & Game had withdrawn their protests.

Rancho Murieta's ultimate total annual water requirements for domestic, industrial and commerical use, evaporation and seepage loss from the reservoirs, and golf course irrigation was estimated to be 6,368 acre feet. Under application 23416 it was proposed that water be diverted from the Cosumnes River and carried by gravity flow to two main holding reservoirs, Chesbro and Guadalupe, with a total storage capacity of 3,900 acre feet. From these reservoirs the water, after passing through a water treatment plant, it was contemplated would then be distributed throughout the project. As we have noted, the smaller reservoirs utilized for recreation and stock watering would be filled primarily by damming natural runoff which would otherwise flow into the Cosumnes. Occasionally, during the dry season, it was projected that the level of these three small reservoirs

would be maintained by pumping water from the main holding reservoirs. Bank's principal witness during the Board hearing gave equivocal responses when asked whether there was planned public access to the three recreational and stock watering reservoirs.

Since, as we have noted, by the time of the Board hearing on application 23416, the only protestant was Fish & Game, the principal portion of the hearing was directed at possible effect of the diversion upon the fish resources in the Cosumnes River.

In August 1971, the Board issued its decision approving the applications to appropriate water. The allowable period of diversion for irrigation, municipal, recreational and stock watering purposes was limited. The Board noted various protests had been filed by other water users from the Cosumnes River, industrial and governmental, who claimed riparian, appropriative and other landowner rights. The Board further noted that all protesters, including Fish & Game had withdrawn their protests. Fish & Game had reached a written agreement with Bank which assured a minimum flow in the Cosumnes to protect fish life, and provided that its terms would be included in any permits issued on the applications to appropriate water.

The Board found that sufficient water was available from the small unnamed streams to provide the water sought in applications 23417 through 23419. Similarly, the Board found that sufficient unappropriated water was available in the Cosumnes River between November 1 and May 31 to satisfy Bank's requirements under application 23416; that the intended use of the water was beneficial; and that the Bank's master plan for the Rancho Murieta development contemplated setting aside 175 acres for dedication as a parkway along the Cosumnes River. In its decision the Board stated, "terms providing for public access to 50-foot strips on both sides of the Cosumnes River within the applicant's project area and public access to the applicant's reservoirs, subject to a reasonable charge for any services or facilities furnished by the permittee, should be included in any permits issued pursuant to Applications 23416 [through] 23419. Such a term will preserve the integrity of the applicant's exemplary master plan in the event the permits are assigned or otherwise transferred. Further, the term will be in the public interest as it will serve to compensate the public for diminished recreational value of the Cosumnes River resulting from lower flows in the river due to the diversions to the applicant's reservoirs for recreational use on private land."

Pursuant to the findings, the Board ordered that the applicant's petitions be granted subject to several conditions, among them, central to our consideration, condition 11 which reads in full as follows: *"The reservoir(s) shall be kept open to the public for recreational use* subject to a reasonable charge for any services or facilities that are provided by permittee; provided, however, that this condition shall not apply to reservoirs used solely for domestic and municipal water supplies authorized by the permit issued pursuant to Application 23416." The dispute centers on the foregoing language which has been emphasized by us.

The Bank thereafter filed a petition for partial reconsideration insofar as the Board's order required public access to the offstream reservoirs (condition 11). In response to the petition, the Board amended its decision in pertinent part herein as follows:

*"Condition 11*

"The record is conflicting as to the petitioner's intent with regard to public access to the project reservoirs and the petition correctly reflects this fact. Nevertheless, this condition was not included because of testimony of the petitioner's witness but for the following reason. The Board's Order will allow the petitioner to reduce the flow of the Consumnes River up to 46 cfs for diversion to offstream storage, part of which will be to provide some 650 acre-feet annually for reservoir evaporation and seepage to maintain the level for recreational purposes. It is difficult to evaluate the effect that this reduction of flow in the river may have on the fishery, but the 'trade-off' will be more nearly equal if the benefits of the diversion for recreation are made public. Accordingly, the petition to delete Condition 11 of the Order is denied and the following sentence is deleted from paragraph 11, page 6 of the decision: 'Public access to all of the reservoirs is planned (RT 37).' "

In different sequence, we consider Bank's contentions.

### THE STANDARD OF REVIEW

The Supreme Court in *Bixby* v. *Pierno* (1971) 4 Cal.3d 130 [93 Cal.Rptr. 234, 481 P.2d 242], has delineated the applicable standards of review following an administrative order or decision pursuant to Code of Civil Procedure section 1094.5. In *Bixby*, the court stated: "By carefully scrutinizing administrative decisions which substantially affect vested, fundamental rights, the courts of California have undertaken to protect such rights, and particularly the right to practice one's trade or profession, from untoward intrusions by the massive apparatus of government. If the decision of an administrative agency will substantially affect such a right,

the trial court not only examines the administrative record for errors of law but also exercises its independent judgment upon the evidence disclosed in a limited trial de novo.

"If the administrative decision does not involve, or substantially affect, any fundamental vested right, the trial court must still review the entire administrative record to determine whether the findings are supported by substantial evidence and whether the agency committed any errors of law, but the trial court need not look beyond that whole record of the administrative proceedings." (4 Cal.3d at pp. 143-144; fns. omitted.)

The high court continued: "The courts must decide on a case-by-case basis whether an administrative decision or class of decisions substantially affects fundamental vested rights and thus requires independent judgment review. [Citations.] As we shall explain, the courts in this case-by-case analysis consider the nature of the right of the individual: whether it is a fundamental and basic one, which will suffer substantial interference by the action of the administrative agency, and, if it is such a fundamental right, whether it is possessed by, and vested in, the individual or merely sought by him. In the latter case, since the administrative agency must engage in the delicate task of determining whether the individual qualifies for the sought right, the courts have deferred to the administrative expertise of the agency. . . .

"In determining whether the right is fundamental the courts do not alone weigh the economic aspect of it, but the effect of it in human terms and the importance of it to the individual in the life situation." (*Id.* at p. 144.) The court, at page 145, added the following words of particular relevance to our consideration: "In analyzing the fundamental nature of the right asserted, this court, manifesting slighter sensitivity to the preservation of purely economic privileges, has found that . . . a water company *had no fundamental vested right to a permit to divert water* from the Kern River. (*Temescal Water Co.* v. *Dept. of Public Works* (1955) 44 Cal.2d 90, 103 . . . .)" (Italics added.)

In *Johnson Rancho County Water Dist.* v. *State Water Rights Board* (1965) 235 Cal.App.2d 863 [45 Cal.Rptr. 589], we noted the agreement of the parties that the scope of review following denial of an appropriation permit was the determination "from the evidence before the board, whether the findings of the board are supported 'by substantial evidence in the light of the whole record.'" (Code Civ. Proc., § 1094.5 subd. (c); 235 Cal.App.2d at p. 866.)

Several provisions of the Water Code shed light on the nature of the plaintiff's interest. Section 1001 reads: "Nothing in this division shall be construed as giving or confirming any right, title, or interest to or in the corpus of any water."

Section 1002 provides: "This division shall not be held to bestow upon any person, except as expressly provided in it, any right where no such right existed prior to the time this division takes effect."

Section 1225 states: "No right to appropriate or use water subject to appropriation shall be initiated or acquired except upon compliance with the provisions of this division.".

The expression of *Bixby*, *Temescal*, the implications of the applicable provisions of the Water Code, and logic point to the conclusion that, when one applies for appropriation of water, he does not have a fundamental vested right in the success of his application. (Deering, Cal. Administrative Mandamus (1966) p. 85; *Madera Irr. Dist.* v. *All Persons* (1957) 47 Cal.2d 681, 688 [306 P.2d 886].)

■ The scope of review to be employed by a court reviewing a decision under Code of Civil Procedure section 1094.5 depends both on the nature of the right presented and also on the nature of the grant of authority to the agency whose action is subject to review. As has been said: "The question presented, on judicial review, if the sufficiency of the evidence is challenged, will be whether the particular function being reviewed is based on a constitutional grant of authority. If so, the substantial evidence test applies. . . . If the source of authority is a statute (and a vested right is affected . . .), the independent judgment test applies." (Deering, Cal. Administrative Mandamus (1966) pp. 78-79.)

■ The Board is a statewide agency and by statute is vested with "all of the powers, duties, purposes, responsibilities, and jurisdiction vested in the Department and Director of Public Works, the Division of Water Resources of the Department of Public Works, the State Engineer, the State Water Quality Control Board, or any officer or employee thereof . . . ." (Wat. Code, § 179.) In the matter before us, the "function being reviewed" is the issuance of permits for appropriation of water. The Board itself and its functions partake of both constitutional and statutory characteristics. The Board itself is a creature of statute. (Wat. Code, § 175.) In its function of issuance or denial of permits to appropriate water it discharges a statutory mandate. (Wat. Code, §§ 1250, 1350-1382.) Nonetheless, in doing so, it pursues at the same time those broad policy expressions and directives contained in article XIV, section 3, of

the Constitution, leading one authority to the conclusion that the origin of the Board's power to issue or deny permits to appropriate water is both constitutional and statutory. (Deering, Cal. Administrative Mandamus (Supp. 1974) p. 204.) We do not further pursue the inquiry, finding it unnecessary to our determination. (See generally, Forkosch, *Judicial De Novo Review of Administrative Quasi-Judicial Fact Determinations,* 25 Hastings L.J. 963.)

From a review of the applicable authorities, we distill the following principles of specific application to the issue before us—the scope of judicial review. Under *Bixby,* we consider the nature of the affected right. If it is one that is fundamental and vested, the court examines the administrative record for errors of law and exercises an independent judgment in a limited trial de novo on the factual record. If the right affected is not a vested fundamental one, the court scrutinizes the record for errors of law and determines whether the findings are supported by substantial evidence. The court also examines the source of the agency's authority. If the power stems from a constitutional grant, a substantial evidence test is applied, but if it arises from statute, the court exercises its independent judgment.

In the case at hand, we are presented with a right neither fundamental nor vested, reviewed by an agency whose powers are largely statutory but partially constitutional. The nature of the right points to substantial evidence review but the character of the agency suggests, in certain instances not applicable here, an independent judgment. We conclude that the standard of review herein is the substantial evidence test.

The scope of our review of the agency order and that of the trial court is identical. ▪ "In a case wherein no limited trial de novo is authorized by law, however, the trial court itself exercises an essentially appellate function in that only errors of law appearing on the administrative record are subject to its cognizance. In such a case, therefore, the trial and appellate courts occupy identical positions with regard to the administrative record, and the function of the appellate court, like that of the trial court, is to determine whether that record is free from legal error." (*Merrill* v. *Department of Motor Vehicles* (1969) 71 Cal.2d 907, 915-916 [80 Cal. Rptr. 89, 458 P.2d 33].)

*Was There Substantial Evidence*
*to Sustain Condition 11?*

We first review certain fundamental principles concerning the responsibility of the Board in allocating the state's water and the form which the

Board's action may take. As we have previously observed: " 'Public interest' is the primary statutory standard guiding the Water Rights Board in acting upon applications to appropriate water. ([Wat. Code] §§ 1253-1256.) The Board is to consider the variety of beneficial uses which the particular water may serve and may subject the appropriation to conditions which will best develop and conserve the water in the public interest. ([Wat. Code] § 1257.) . . .

█ "The findings of the Water Rights Board need not be stated with the formality required in a judicial proceeding; 'their basic purpose is to enable the reviewing court to determine whether they are supported by sufficient evidence or a proper principle and to apprise the parties as to the reason for the administrative action in order that they may decide whether, and upon what grounds, additional proceedings should be initiated.' (*Temescal Water Co.* v. *Department of Public Works, supra,* 44 Cal.2d at p. 102.)" (*Johnson Rancho County Water Dist.* v. *State Water Rights Board, supra,* 235 Cal.App.2d at p. 874.) █ We further stated, "Unless it can be demonstrated that the board's actions are not grounded upon any reasonable factual basis the courts should not interfere with its discretion or substitute their discretion for that of the board. (*Ferrante* v. *Fish & Game Com.,* 29 Cal.2d 365, 374 . . . ; see *Temescal Water Co.* v. *Department of Public Works, supra,* 44 Cal.2d at p. 102.)" (*Id.* at p. 876).

█ Preliminarily, in searching the record for a "reasonable factual basis" for the Board's action, we focus deferentially on the reasons advanced by the court for upholding the Board's action. We next examine the grounds stated by the Board for its imposition of condition 11. Finally, we scrutinize the record before the Board to determine the presence or absence of substantial evidence supporting condition 11.

The trial court in its minute order of October 4, 1972, denying the peremptory writ said: "The Court first has concluded that the substantial evidence test limits the scope of its review. On this basis, the Court has concluded that substantial evidence does support both conditions 11 and 22 imposed by Respondent State Water Resources Board.

"It is clear that the doctrine of estoppel and waiver applies to condition 11—the Board basically indicated that it would require as a condition what petitioner itself proposed."

The trial court while generally noting that substantial evidence supported condition 11, did not identify any such evidence documentary or oral. █ The specific basis for the court's ruling as to condition 11

was the court's determination that "estoppel and waiver" barred the Bank's challenge to it. The court stressed that the estoppel argument was particularly applicable to the condition no longer under attack but it also related estoppel and waiver to condition 11. While the court does not point to the precise evidence upon which it grounds its conclusion that an "estoppel and waiver" exists, its additional expression that condition 11 was "what petitioner itself proposed" provides the key. We conclude that the court relied on evidence which we have previously described as "equivocal" to the effect that the Bank planned public access to the recreational reservoirs.

We review the record for evidence supporting waiver and estoppel as to access to the reservoirs. Bank's first witness before the Board was David U. Holmes, civil engineer of Palo Alto, employed by the planner and engineer of Rancho Murieta. Mr. Holmes first told the Board that there would be public access to the recreational reservoirs. He then stated that the public would have access through a park. He then affirmed that the public would have access to all reservoirs. He testified that he thought a correct statement of the Bank's position was that "it hasn't been finally decided that there will be or will not be public access to the reservoir or green belt open spaces. . . . That still could go either way. . . ." He finally concluded that "It has not yet been determined."

We regard such statements as equivocal. They do not constitute a clear expression which is fairly interpreted as a "proposal" nor do they represent a "waiver," i.e., the intentional relinquishment of a known right.

The Board itself was aware of the uncertain nature of the Bank's position on the matter of access. We find, for example, contained in the Board's engineering staff analysis dated February 8, 1971, the following relevant extract: "The record is unclear as to the applicant's intent with regard to public access to the reservoirs in his project. The master plan shows a land use classification 'urban park' adjoining a portion of most of the reservoirs. However, questioning of the applicant's witnesses, indicated that public access to the reservoirs was not necessarily the intent of the developers. Even if it is, the sale of units of the project to other developers might result in different zoning from that proposed in the master plan." Furthermore, the record shows that while the original "Decision Approving Applications" dated August 5, 1971, contained the statement: "Public access to all the reservoirs is planned," this statement was expressly deleted by the Board in its order amending decision which noted that "The record is conflicting as to the petitioner's intent with regard to public access. . . ." The board further stated that it had imposed the

condition because of an inconclusive effect on the "fishery" and the "trade-off" would be more nearly equal if access was required.

No other oral testimony bore on the matter of reservoir access. We do not discern in the record the traditional elements normally required as a basis for application of equitable estoppel. (*Driscoll* v. *City of Los Angeles* (1967) 67 Cal.2d 297, 305 [61 Cal.Rptr. 661, 431 P.2d 245]; *Potstada* v. *City of Oakland* (1937) 30 Cal.App.3d 1022, 1028 [106 Cal.Rptr. 705].)

 The Board in its Decision Approving Applications dated August 5, 1971, considered the matter of public access but focused largely on access to the Cosumnes River. It noted that Bank proposed dedicating for park purposes to the Sacramento County Parks and Recreation Department 175 wooded acres along both sides of the Cosumnes in 40 to 50-foot strips. This area would be open to the public thus assuring complete access to the Cosumnes along its entire reach through the project. It predicted that when the federal government had completed its Nashville Project on the Cosumnes upstream from the points of diversion, that increased trout, steelhead and warm water fishing would be available along the Cosumnes. It further noted that throughout a 16-mile stretch of the river, the project land would be the most convenient area of access to the river.

The Board then determined that access to a 50-foot strip on both sides of the Cosumnes *"and public access to the applicant's reservoirs"* (italics added) should be included in the permits. The stated reasons for the conditions were that they would "preserve the integrity of the applicant's exemplary master plan in the event the permits are assigned or otherwise transferred" and further that they would "be in the public interest as it would serve to compensate the public for *diminished recreational value of the Cosumnes River resulting from lower flows* in the river due to diversions to the applicant's reservoirs for recreational use on private land." (Italics added.) Condition 11 was then imposed in the following form: "The reservoir(s) shall be kept open to the public for recreational use subject to a reasonable charge for any services or facilities that are provided by permittee; provided, however, that this condition shall not apply to reservoirs used solely for domestic and municipal water supplies authorized by the permit issued pursuant to Application 23416."

Following the Bank's petition for partial reconsideration, the foregoing portions of the original decision were amended in part by the order of September 16, 1971. The Board as quoted on page 204, *ante*, clarified its reasons for imposing condition 11. Among other things it said: ". . . *It is difficult to evaluate the effect that this reduction of flow in the river*

*may have on the fishery, but the 'trade-off' will be more nearly equal if the benefits of the diversion for recreation are made public. . . ."* (Italics added.)

It becomes clear that the Board's reason for condition 11 was that the approved diversion would reduce the flow of the river which, in turn, would have an uncertain effect on the "fishery." Further, the diversion would result in "diminished recreational value" of the Cosumnes because of its lower level downstream. These two factors—the undetermined effect on fish and lessened recreational prospects caused by lower water level—prompted the Board to require as a "trade-off" public access to the Rancho Murieta recreational reservoirs.

As we have noted, when the original applications were filed several protests resulted, among them that of Fish & Game. On October 2, 1970, Bank and Fish & Game signed a written agreement the preamble of which recited that the Cosumnes River supported fish of different species and that the parties had agreed on the terms and manner of diversion which would "assure the continued protection and maintenance of the fishery resources of the Cosumnes River." For the purposes of "the protection and preservation of fish life" the parties agreed upon six detailed conditions regulating the amount and periods of diversion. These conditions constituted a detailed formula for withdrawal of water that were keyed to seasonal dates, to maximum and minimum total flows in the river, and to the manner of measurements of the flows. The formula also provided for continuing jurisdiction in the Board to modify the minimum fisheries' flows requirements to conform to such subsequent determinations as, periodically, the Board might make to assure fish protection.

The oral testimony was offered by four witnesses. Three testified on behalf of the Bank, David U. Holmes, Dr. Joseph B. Franzini, Stanford professor and water consultant to the project, and Dr. Joel F. Gustafson, ecology professor at San Francisco State College. Robert Reavis, a fishery biologist employed by Fish & Game testified on its behalf. We have carefully reviewed their testimony. A substantial quantity of documentary evidence was introduced including maps, diagrams, reports, surveys, and the staff report of Mr. Reavis dated August 1970. This latter report dealt exclusively with the effect on salmon of the proposed diversions. In order to protect the salmon and warm water fish three conditions to the diversion were recommended: (1) There would be no diversion at all when the Cosumnes flow at the Michigan Bar measuring station is less than 70 cfs; (2) when the flow is 75 to 175 cfs, up to 6 cfs may be diverted but the flow may not be reduced below 70 cfs; and (3) when the flow exceeds 175 cfs

the maximum proposed diversion is allowed. The first two recommenda-tions were incorporated in the decision and the third, as modified, was also included. The record shows that the fishery demands of the Cosumnes were adequately met by the conditions imposed.

The terms of the formula were incorporated in the decision of the Board and Fish & Game withdrew its protest. The decision recognized that the formula agreed upon by Bank and Fish & Game was not binding upon the Board "and shall not be construed as a finding by the Board that the amount of water is either adequate or required for such purposes."

While Fish & Game's determination that the formula fixed in the agree-ment is adequate to support fish life is not binding on the Board, Fish & Game's judgment in this matter is entitled to great weight. Charged with a statutory obligation, Fish & Game is the guardian and custodian of the pub-lic's deep and continuing interest in the fish and game resources of this state. It has the collective experience and expertise to make the essential determinations in the technical areas of water flows and fish maintenance. The agreed formula was negotiated and approved by Fish & Game and we cannot presume that its conclusions were not carefully reached. Of greater significance is the fact that nowhere in the record does there appear before the Board any evidence that adoption of the formula would adversely affect, diminish, or impair the fishery. We, accordingly, conclude that the first basis for imposition of the condition, preservation of the fish life in the Cosumnes downstream from the diversion, has been otherwise adequately assured.

Assuming, however, that the reason for condition 11 as stated in the amended decision does not fully express the cause for its imposition, we examine the remaining reason given by the Board for the condition as stated in the initial decision—the diminished recreational value of the Co-sumnes because of the lessened flow. By applying the same measure as that applied by the trial court, we ask the question, is there substantial evidence in the record to support the condition? We again inquire whether there is any reasonable factual basis to support the Board's action. We may not interpose our discretion for that of the Board if there is such a basis. (*Ferrante* v. *Fish & Game Commission* (1946) 29 Cal.2d 365, 374 [175 P.2d 222]; *Johnson Rancho County Water Dist.* v. *State Water Rights Board, supra,* 235 Cal.App.2d 863, 876.) We also bear in mind, as we have pre-viously noted, that the primary statutory standard controlling the Board's consideration of applications to appropriate water is the public interest. (*Temescal, supra,* 44 Cal.2d at p. 102.) In the exercise of its powers, the Board is vested with a broad discretion. (Wat. Code, §§ 1253, 1255.)

The remainder of our inquiry relates to whether substantial evidence in the record establishes a "diminished recreational value" of the Cosumnes warranting a "trade-off" or exchange for condition 11. Our review of the record discloses no such evidence. There are clear inferences from the record that the water level of the Cosumnes below the diversion during certain times of the year will be lower because of it, but there is no testimony as to its degree or, more importantly, as to its effect in terms of recreational use of the river, present or prospective. No testimony written or oral was presented which in any substantial manner pointed to the specifics of impairment of recreational activities.

We note that one of the exhibits, a report prepared by the U.S. Department of the Interior, on the Feasibility of Water Supply Development, Cosumnes River Diversion of the Central Valley Project, described general recreational activities around *reservoirs* as "boating, swimming, waterskiing, and fishing," and that shoreline activity includes "camping, picnicking, sightseeing, hiking and related activities." We envision that the boating and waterskiing activities in a stream like the Cosumnes because of its size and configuration would be very limited with or without the diversion, but the remaining recreational uses will be unimpaired insofar as disclosed by the Board record. No evidence, written or oral, was presented which indicated that the lowered water level would change or affect the recreational utilization of the Cosumnes downstream from the diversion.

We have heretofore underscored the primacy of the "public interest" in the considerations before the Board and have emphasized the broad discretion vested in it. Nonetheless, we apply a measure of substantiality in reviewing the evidence supporting the Board's action. It has been said that "if the word 'substantial' means anything at all, it clearly implies that such evidence must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with 'any' evidence. It must be reasonable in nature, credible, and of solid value; it must actually be 'substantial' proof of the essentials which the law requires in a particular case." (*Estate of Teed* (1952) 112 Cal.App.2d 638, 644 [247 P.2d 54].)

The record, in our view, is barren of evidence which is of "ponderable legal significance" in support of the conclusion that the diversion would result in a reduction in the recreational value of the Cosumnes. While fully accepting the rule giving primacy to the public interest, we may not leave to speculation the nature of its impairment. Condition 11 constitutes an onerous burden. The Board, in our view, has the jurisdiction and the right to impose a condition requiring public access but only for precise and specific reasons founded on tangible record evidence.

It is argued, finally, that since Bank has projected an annual evaporative loss of 650 acre feet in the smaller reservoirs which is to be replaced by water from the Cosumnes, the public interest will be served by an exchange, the public surrendering the diverted water and receiving the public access to the reservoirs, and the Bank surrendering privacy of the reservoirs and receiving the diversion for evaporative replacement. The testimony on the Cosumnes flow reflected that its annual average runoff was 354,000 acre feet, of which 6,368 acre feet were proposed for the project diversion. Of this latter amount, 650 acre feet were for evaporation replacement. Conditions imposed must be "grounded upon a reasonable factual basis." We have grave reservations about the relative equality of the "quid pro quo" between the parties. We also note that it is unclear whether the Board's reference to the "trade-off" was directed to the evaporation, fish, or a combination of both. The fish requirement having been otherwise met, we are left with the evaporation element. We conclude that the price exacted therefor, permanent public access to the recreation reservoirs, is not commensurate with the Bank's gain, which gain is more than offset by Bank's dedication, previously noted, of the shorelines of the river.

To summarize, we conclude that the record lacks substantial evidence supporting condition 11 and it must fail.

The judgment of dismissal is reversed.

Let a peremptory writ of mandate issue commanding respondent Board to delete condition 11 from its decision No. 1378 and from its order amending decision 1378.

As we have previously noted, the duty of allocating the State's water is vested in the Board. (Wat. Code, § 1250; *Temescal Water Co.* v. *Dept. Public Works* (1955) 44 Cal.2d 90, 103 [280 P.2d 1]; *Johnson Rancho County Water Dist.* v. *State Water Rights Board, supra,* 235 Cal.App.2d p. 876.) The Board may condition an application in such a manner as to insure protection of the public interest in the water appropriated. (Wat. Code, § 1253; *Temescal, supra,* at p. 100; *Johnson Rancho County Water Dist., supra,* at p. 876.) Our role is different. We consider the issues presented solely in our appellate capacity of reviewing alleged errors of law. We cannot predict whether or not the Board would have issued the permit in the absence of condition 11. Such determinations are properly within the discretion of the Board.

The matter is remanded to the Board for such reconsideration of its approval of applications 23416, 23417, 23418 and 23419 as it may elect

in the light of the views herein expressed. Such reconsideration, if any, shall be based upon the present record.

Regan, J., and Good, J.,* concurred.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Chairman of the Judicial Council.